**BOURNE CO., Plaintiff,**

and

**Velma Mae Overton, Additional Plaintiff On Supplemental Complaint,**

v.

**MPL COMMUNICATIONS, INC. d/b/a Edwin H. Morris & Co., a division thereof, Richard Marx, Kenneth Marx, and Miriam Stern, Defendants.**

**No. 79 Civ. 1383 (JES).**

United States District Court, S.D. New York.

Dec. 22, 1987.

Abeles Clark and Osterberg, New York City (Robert Osterberg, of counsel), for plaintiff.

Eastman & Eastman, New York City (John Eastman, of counsel), for defendants (MPL Communications, Inc. d/b/a Edwin H. Morris & Co., Richard & Kenneth Marx).

Feinman & Krasilovsky, New York City (M. William Krasilovsky, of counsel), for defendant (Miriam Stern).

Linden and Deutsch, New York City (Frederick F. Greenman, Jr., of counsel), for amicus curiae (AGAC/The Songwriters Guild).

## OPINION AND ORDER

SPRIZZO, District Judge:

This action involves the ownership of the rights and interests arising from the copyright of a musical composition entitled "Cecilia." Competing claims to these rights are presented by the two main parties to this action, plaintiff Bourne Co. ("Bourne") and defendant MPL Communications, Inc. ("MPL"), both music publishers. The parties agree that prior to May 23, 1981, Bourne was the sole proprietor of the copyright at issue. *See* Amended Final Pre–Tri-

al Order ("PTO") at 8. The dispute thus concerns the parties' rights in "Cecilia" only during the 19–year extended renewal copyright period, beginning on May 23, 1981, which was created by the Copyright Act of 1976 ("the 1976 Act" or "the Act"), and claims for damages incident thereto. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.R. 52 following a bench trial.

## STATUTORY BACKGROUND

The Copyright Act of 1976, enacted after twenty years of drafting and debate, increases the protection of authors in several respects, two of which are directly pertinent to this action. Prior to the enactment of the 1976 Act, the law provided for copyright protection extending through two copyright terms of 28 years each, for a total of 56 years. *See Mills Music, Inc. v. Snyder,* 469 U.S. 153, 157, 105 S.Ct. 638, 642, 83 L.Ed.2d 556 (1985). The 1976 Act extended the duration of existing copyrights by creating a new 19–year extended renewal term. *See* 17 U.S.C. § 304(b) (1982). In addition, in order to correct "the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited," authors were given a right to terminate unremunerative transfers and to renegotiate new grants after publishers had begun to exploit such rights. *See* H.R. Rep. No. 1476, 94th Cong., 2d Sess. 124, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5740. Thus, the Act allows an author or certain statutory successors to terminate a transfer in a pre-existing copyright after its 56th year, or at the beginning of its 19–year extended renewal term. *See* 17 U.S.C. § 304(c)(3).[1]

---

**1.** Section 304 governs terminations of copyright transfers executed prior to January 1, 1978. *See* 17 U.S.C. § 304(c) (1982). An analogous provision, § 203, governs terminations of copyright transfers executed on or after January 1, 1978. *See id.* at § 203(a).

The termination provision applicable here, § 304(c), provides that termination can only be effected during a five-year period beginning at the end of 56 years from the date the copyright

was originally secured (*i.e.,* during the first five years of the extended renewal period). *See id.* at § 304(c)(3). To be valid, a written notice of termination must be served on the grantee not less than two nor more than ten years before the specified effective date of termination. *See id.* at § 304(c)(4)(A). The notice must also comply with certain regulations promulgated by the Copyright Office. *See id.* at § 304(c)(4)(B); 37 C.F.R. § 201.10 (1987). Absent a valid termi-

When a termination is effected, all rights covered by the terminated grant revert, on the effective date of termination, to the author or his statutory successor. *See id.* at § 304(c)(6). This reversion is subject to an exception that permits the use of a previously prepared derivative work to be continued pursuant to the terms of the grant even after termination. *See id.* at § 304(c)(6)(A); *see also Mills Music, supra,* 469 U.S. at 162, 105 S.Ct. at 644. In further limitation on the termination rights of the author, the Act provides that "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid *only if it is made after the effective date of the termination.*" *See id.* at § 304(c)(6)(D) (emphasis added). An exception to this provision allows the author or his statutory successor to make a grant prior to the effective date of termination and after the notice of termination has been served, provided that the grant is made to the original grantee (or such grantee's successor in title) whose interest has been terminated. *See id.*

## FACTS

At some point prior to May, 1925, Herman Ruby ("Author") and Dave Dreyer collaborated in composing a musical work entitled "Cecilia."[2] By agreement dated May 20, 1925, the Author and Dreyer jointly assigned all copyright interest in "Cecilia" to Irving Berlin, Inc. ("Berlin"), a publishing company. *See* PTO at 6–7. Berlin obtained a copyright on the song as an unpublished work. A further assignment of renewal rights for the second 28–year term in "Cecilia" was executed by the Author to ABC Music Corp. ("ABC"), a successor in interest to Berlin. *See id.* at 7. In 1967, plaintiff Bourne acquired all rights in the copyright of "Cecilia" through an assignment from the successor in interest to ABC. *See id.* Bourne and its predecessors in interest have, through licenses, prepared over 40 printed arrangements of "Cecilia" and 163 recorded versions of the song. *See id.* at 7–8.

In 1959, the Author died, survived only by his widow Edwyna Ruby ("Ruby"). *See* PTO at 8. Ruby was the statutory successor to the Author's entire termination interest. *See* 17 U.S.C. § 304(c)(2)(A). In 1977, defendant Miriam Stern, a consultant dealing in termination interests, contacted Ruby for the purpose of inducing her to exercise her termination right in "Cecilia" and offered to renegotiate a new transfer of the song in return for a commission. *See* Trial Transcript (Tr.) at 108–10, 116–18. On February 24, 1978, Stern, on behalf of Ruby, served a notice of termination on plaintiff Bourne with respect to the extended renewal period in "Cecilia." *See* PTO at 9. The notice specified May 23, 1981 as the effective date of termination. *See* Plaintiff's Exhibit ("PX") 11.

On May 23, 1978, three years before the effective date of termination, Ruby, through her agent Stern, executed an agreement ("the Ruby–MPL agreement") granting defendant MPL all rights in "Cecilia" for the extended renewal period. *See* PTO at 10. No one seriously disputes that the Ruby–MPL agreement is invalid because MPL was not the original grantee and it was executed prior to the effective date of termination.[3] *See* Tr. at 65–66.

nation pursuant to the terms of § 304(c), the grant, if it does not provide otherwise, continues in effect for the extended renewal term. *See id.* at § 304(c)(6)(F).

**2.** The fact that "Cecilia" is a joint work, *see* 17 U.S.C. § 101 (definition of "joint work"), is immaterial insofar as the right of termination is concerned. Section 304(c)(1) provides that "[i]n the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, *to the extent of a particular author's share* in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by [his statutory successors]." *Id.* at § 304(c)(1) (emphasis add-

ed). Thus, although Herman Ruby owned only a one-half interest in the song, for the purposes of this decision regarding his interest, he can be treated as the sole author. *See Mills Music, Inc. v. Snyder,* 469 U.S. 153, 156 (1985), 105 S.Ct. 638, 641, 83 L.Ed.2d 556; Stein, *Termination for Transfers and Licenses Under the New Copyright Act: Thorny Problems of the Copyright Bar,* 24 UCLA L.Rev. 1141, 1158 (1977).

**3.** The parties differ as to whether the Ruby–MPL agreement was void or voidable. However, in light of MPL's subsequent acquisition of certain royalty rights from Kenneth and Richard Marx, *see infra,* MPL was willing to concede

■ On March 21, 1979, Ruby died testate, prior to the effective date of termination. *See* PTO at 12. Section 304 provides, however, that future rights that will revert upon termination become vested on the date the notice of termination is served. *See* 17 U.S.C. § 304(c)(6)(B). Because Ruby died after the notice of termination was served, her rights under the terminated grant had vested and thus passed to her estate. *See id.* at § 304(c)(6)(D); 3 M. Nimmer, *Nimmer on Copyright*, § 11.03[A], at 11–25 to 11–26 (1986).

■ Ruby's will, duly admitted to probate, provided that all royalties to which she "might be entitled" were to go to her second husband, Hugh P. Coffey (a/k/a Robert Coffey) during his lifetime, and after his death, to defendants Kenneth and Richard Marx ("the Marx defendants") equally. The residue of her estate went to Coffey. *See* Defendants' Exhibit ("DX") M (Will of Edwyna Ruby Coffey). The will did not specifically devise the copyright in "Cecilia" nor did it specifically refer to the termination rights. Thus, the copyright in the song, which was to revert back to Ruby upon the effective date of termination, was not the subject of a specific bequest and passed to the residual beneficiary, Coffey.

Coffey died on January 4, 1981, prior to the date termination became effective, *see* PTO at 12, and the copyright in "Cecilia" which was to revert to Ruby after the effective date of termination passed to Coffey's residual beneficiary, additional plaintiff Velma May Overton, *see* PX 71 (Last Will and Testament of Robert P. Coffey).

Thereafter, by agreement dated May 23, 1981, the date termination became effective, MPL acquired all of the Marx defendants' rights in "Cecilia" for the extended renewal term ("the Marx–MPL agreement"). *See id.* at 14. In July of 1982, plaintiff Bourne entered into an agreement with Overton, pursuant to which it acquired all her rights in "Cecilia" for the extended renewal term. *See id.* at 15. The competing claims of Bourne and MPL are based on these assignments.

The parties in this action seek many types of relief. *See* PTO at 2–5. Plaintiff Bourne seeks declaratory and injunctive relief as well as damages in its three asserted claims. With respect to the first claim, Bourne seeks: (1) a declaration that the Ruby–MPL agreement is invalid; (2) a declaration that the Marx–MPL agreement is invalid; (3) a declaration that the notice of termination is invalid; and (4) an injunction prohibiting defendants from representing that Ruby terminated Bourne's interest under the extended renewal term or representing that MPL has any interest in "Cecilia" for the extended renewal term. *See id.* at 2–3.

The relief sought by additional plaintiff Overton's claim, which Bourne joins in requesting, essentially overlaps that sought with respect to Bourne's first claim, except that the supplemental complaint also seeks a judgment declaring that Bourne is possessed of all rights in "Cecilia" under the extended renewal term. *See id.* at 3–4. With respect to its second claim, Bourne also seeks a declaration that no termination of Bourne's interest in the extended renewal copyright of "Cecilia" affects its rights to continue to use all derivative works prepared under the terms of the original grants. *See id.* at 3. With respect to its third claim, Bourne seeks damages, alleging that the premature transfer of rights to MPL pursuant to the Ruby–MPL agreement destroyed its "exclusive statutory right of first refusal." *See* Second Amended Complaint ("Complaint") at ¶ 36; PTO at 2.

Defendants assert two counterclaims. In the first, the Marx defendants seek an accounting from Bourne of royalties arising from the extended renewal term.[4] *See*

---

at trial that the Ruby–MPL agreement was "absolutely not worth the paper it [was] printed on." *See* Tr. at 66.

**4.** The counterclaim seeks an accounting for royalties "which ... accrued or were received" by Bourne during the extended renewal term. *See*

Defendants MPL Communications, Inc. and Richard and Kenneth Marx's Answer to the Plaintiff's Amended Second Complaint and Supplemental Complaint at ¶ 6. Although this language suggests that royalties arising from the first two periods but paid during the extended

*PTO* at 4. In the second, the Marx defendants and MPL seek a declaration that MPL is the owner of "Cecilia" during the extended renewal term and is therefore entitled to all rights and royalties flowing from such ownership. *See id.* at 4–5.

## DISCUSSION

### A. *Copyright and Royalty Claims*

Examining the statute, the sequence of events recounted above, and the wills of Ruby and Coffey, the Court concludes that Bourne owns the copyright in "Cecilia" during the extended renewal term. As noted above, the termination rights vested the day Ruby served the notice of termination and therefore passed pursuant to the terms of Ruby's will. Because these rights were not the subject of a specific bequest, the copyright of "Cecilia" for the extended renewal period passed to Coffey, the residual beneficiary. Upon Coffey's death, the copyright for that period passed to additional plaintiff Overton pursuant to the terms of Coffey's will. Subsequently, Bourne acquired all Overton's rights in "Cecilia" and, therefore, is now the owner of the copyright.

MPL, however, argues that since it acquired the Marx defendants' rights in "Cecilia" for the extended renewal term and that since Ruby bequeathed to the Marx defendants "any and all ASCAP[5] royalties, and any and all other royalties, to which [she] might be entitled," they are entitled to the royalties flowing from "Cecilia" for the extended renewal period. *See* Defendants MPL Communications, Inc. and Kenneth Marx and Richard Marx's Proposed Findings of Fact and Conclusions of Law at 4. Bourne disagrees, arguing that the Marx defendants' only interest is in the writer's share of royalty payments for the first two terms, which Ruby would have been entitled to receive. *See* PTO at 18; *see also* Letter of Robert C. Osterberg to the Court (Aug. 7, 1987).

As noted above, the Court finds Bourne's position to be more persuasive. It is clear that Ruby herself was not entitled to any royalties flowing from the extended renewal period prior to the effective date of termination, because prior to that date no such royalties existed. Ruby's death prior to the effective date prevented her from becoming entitled to those royalties. Since the will does not specifically mention the termination rights, there is no basis to conclude that Ruby intended to separate royalties for the extended renewal period from the other termination rights attributable to the copyright itself, which passed as part of the residuary estate. This is especially true because the right to receive royalties during the renewal term is the most valuable part of the termination rights.[6]

Moreover, to sustain a bequest of royalties in the extended renewal term prior to the effective date of termination, even if such a bequest had been specifically made,

renewal term are in dispute, defendants' counsel conceded at trial that "[t]he only period in issue is the extended renewal term." *See* Tr. at 149; *see also* PTO at 11. Thus, this Opinion will deal only with the parties' claims to royalties attributable to the extended renewal period.

**5.** ASCAP royalties are collected by the American Society of Composers, Authors and Publishers ("ASCAP"), which licenses copyrighted songs for public performance (*e.g.,* to radio stations), collects royalties from such copyright users resulting from the performance of the copyrighted work, and pays those royalties in shares to the author and publisher. *See Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 4–5, 99 S.Ct. 1551, 1554–1555, 60 L.Ed.2d 1 (1979). The other type of royalties involved in this case, mechanical royalties, are received by a copyright owner for individual sound recordings of that song manufactured and sold by record companies. Once a copy-

right in a song is assigned to a publisher, the publisher then issues licenses to record companies to make mechanical reproductions of the work. Percentages of royalties for each reproduction prepared and sold pursuant to a license are then collected and remitted in percentages to the publisher and the author. *See Mills Music, supra,* 469 U.S. at 158, 105 S.Ct. at 654.

**6.** The rights of copyright include the right to reproduce the work in phonorecords, the right to distribute phonorecords of the work, the right to perform or to display the copyrighted work publicly, and the right to prepare derivative works based upon the copyrighted work. *See* 17 U.S.C. § 106. Thus, ownership of the termination rights but not the royalty rights would most likely entitle the holder of those rights only to prepare derivative works or to display the work publicly.

might well be inconsistent with both the statute and the congressional purpose in enacting that statute. It would make little sense to forbid the transfer of renewal rights in the copyright to a person other than the grantee prior to the effective date of termination if the most valuable aspect of those renewal rights (*i.e.,* the royalties attributable to that period) could be validly assigned or bequeathed prior to that date.

It is true that the legislative history of § 203, an analogous termination provision,[7] reflects that Congress was concerned that third parties would buy up contingent future termination rights as a form of speculation and thereby deprive the original grantee of the opportunity to negotiate a further transfer, and that it was this concern that led Congress to require that a grant of termination rights to a new grantee would be valid only if made after the effective date of termination. *See, e.g.,* H.R.Rep. No. 2237, 89th Cong., 2d Sess. 123–24 (1966); Register of Copyrights, 89th Cong., 1st Sess. *Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law; 1965 Revision Bill* 76 (H. Judiciary Comm. Print

1965). These dangers of speculation are not present with respect to bequests.

■ Nevertheless, a bequest of royalties for the extended renewal term would clearly interfere with the unequivocal intent of Congress to give original grantees a "preferred competitive position." H.R.Rep. No. 2237, *supra,* at 124; *see also* H.R.Rep. No. 1476, *supra,* at 127, *reprinted* at 5743. Thus, as a matter of both will construction and statutory interpretation, the Court concludes that Bourne is the owner of the copyright in "Cecilia" for the extended term and that MPL is not entitled to royalties arising during that period.[8]

### B. *Statutory Right of First Refusal*

In addition to a judgment declaring it to be the owner of the copyright in "Cecilia," Bourne also seeks relief for the alleged violation of what it describes as a "statutory right of first refusal." *See* Complaint at ¶ 36; Post–Trial Brief of Plaintiff and Additional Plaintiff on Supplemental Complaint ("Pl. Post–Trial Brief") at 2–8. Bourne claims that this right is found in § 304(c)(6)(D), which provides that further grant of any right covered by a terminated

---

7. For discussion purposes, legislative history often links § 304 together with § 203, an analogous termination provision which applies to transfers executed on or after January 1, 1978 (§ 304 applies to transfers executed prior to January 1, 1978). *See Harry Fox Agency, Inc. v. Mills Music, Inc.,* 543 F.Supp. 844, 855 (S.D.N.Y. 1982), *rev'd,* 720 F.2d 733 (2d Cir.1983), *rev'd sub nom. Mills Music, Inc. v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). Thus, comments on § 203 are equally applicable to § 304. *See id.*

8. As a fall-back position, Bourne argues that even if MPL had obtained all rights in the extended renewal period, all recordings and printed arrangements of "Cecilia" prepared by Bourne and its predecessors in the first two terms are "derivative works" which Bourne is entitled to continue using according to the terms of the original grant. *See* Post–Trial Brief of Plaintiff and Additional Plaintiff on Supplemental Complaint at 14; 17 U.S.C. § 304(c)(6)(A). MPL concedes that the recorded versions of "Cecilia" are derivative works within the meaning of the statute, but disputes Bourne's claim that the printed arrangements constitute derivative works that qualify for the privilege of continued utilization after termination without regard to their originality. *See* Tr. at 96–100. Bourne, however, contends that

because the definition of "derivative work" includes arrangements, all sheet music arrangements of the song "Cecilia" must be regarded as derivative works as a matter of law without regard to whether they are of sufficient originality to be in themselves copyrightable. *See* 17 U.S.C. § 101. Although this issue appears to be academic in light of the Court's holding that Bourne is the owner of all rights in "Cecilia" for the extended term, the Court does not find Bourne's argument persuasive. Neither the legislative history of the 1976 Act nor the policies underlying the copyright law support the broad reading of the statute that Bourne suggests, especially since in the absence of such originality, the arrangements would not have been entitled to copyright protection in the first place. *See* Curtis, *Caveat Emptor in Copyright: A Practical Guide to the Termination-of-Transfers Provisions of the New Copyright Code,* 25 Bull. Copyright Soc'y 19, 58 (1977–1978); *see also Gracen v. Bradford Exchange,* 698 F.2d 300, 305 (7th Cir. 1983); *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 492 (2d Cir.) (en banc), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). For further discussion of the legislative history of the 1976 Act, see the briefs of amicus curiae AGAC/The Songwriters Guild.

grant is valid only if it is made after the effective date of termination, unless such further grant is between the author or his successors and the original grantee or its successor in title. *See* 17 U.S.C. § 304(c)(6)(D). Bourne contends that this provision creates an "exclusive period of negotiation" and a "right of first refusal" in favor of the original grantee's successor —Bourne. *See* Tr. at 56–71.

■ Bourne further contends that the violation of this right by Stern [9] and MPL, who induced Ruby to sign the invalid Ruby–MPL agreement, prevented Bourne from taking advantage of its preferred competitive position to negotiate with Ruby for a new grant, thus invalidating the otherwise effective termination [10] and giving rise to a private right of action for damages. *See* Tr. at 61–65; Post–Trial Brief of Plaintiffs at 8–13. This argument lacks merit and must be rejected.[11]

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S.

189, 194, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985). Bourne's interpretation of section 304(c)(6)(D) contravenes the clear meaning of the statutory language. The statute provides merely that an agreement between the terminating party and the terminated grantee prior to the effective date of termination is the only one that is valid and enforceable against the former. The statute does not provide that any agreement negotiated by the terminating party must first be offered on the same terms to the terminated grantee, which is what a right of first refusal, as it is commonly understood, would require.

■ Nor does the statute provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else. All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights. The provision does give the terminated grantee a preferred competitive position but "[i]f the author

9. In her trial brief, Stern notes that the only claim remaining as to her relates to the alleged interference with Bourne's statutory right of first refusal. *See* Trial Brief of Defendant Miriam Stern at 1. Thus, Stern posits, "[i]t would seem that the court now lacks subject matter jurisdiction with respect to Stern...." *Id.* at 2. This argument seems incomprehensible in light of the fact that Bourne's alleged statutory right of first refusal, if it exists at all, arises under § 304(c)(6)(D), and, therefore, clearly raises a federal question. *See* 28 U.S.C. § 1331 (1982).

10. The parties agree that the termination notice was timely served in this case, *see* PTO at 9, and Bourne has not alleged any deficiency in the form of the notice, although it does argue that "the termination notice, if valid, could only apply to the unpublished edition of CECILIA," *see* Plaintiff's Trial Memorandum of Law at 17. The meaning of this assertion is not clear. If Bourne is arguing that the termination agreement did not terminate its rights in original derivative works, otherwise entitled to copyright protection, the Court agrees. *See supra* note 8. However, if Bourne is arguing that the termination notice was ineffective to terminate Bourne's rights in a published edition of "Cecilia" identical to the unpublished original edition, its argument is rejected.

11. Bourne also argues that an "appropriate sanction" for the invalid Ruby–MPL agreement would be to declare the termination notice void. *See* Plaintiff's Trial Memorandum of Law at 16. The Court finds no basis, statutory or otherwise, for the imposition of such a sanction, but need not reach the issue because of its conclusion that Bourne is the owner of the copyright "Cecilia" for the extended renewal term. Similarly, the Court need not reach Bourne's argument that the Marx–MPL agreement is void because it was negotiated prior to the effective date of termination. *See id.* at 22. The Court notes, however, that this argument is not supported by either the statute or the legislative history. Indeed, the statute merely provides that a grant to someone other than the original grantee is valid "only if it is *made* after the effective date of termination," not that such a grant is valid only if *negotiated* after the termination date. *See* 17 U.S.C. § 304(c)(6)(D) (emphasis added). Bourne does not dispute that the Marx defendants and the MPL entered into the Marx–MPL agreement subsequent to May 23, 1981. *See* [Plaintiffs'] Proposed Findings of Fact and Conclusions of Law at 63 (agreement entered into subsequent to May 23, 1981 but dated as of May 23, 1981).

can afford to wait for competitive offers until after the effective date of termination, he can overcome any advantage the grantee or successor may seek to gain from the preferential position." *See* Melniker & Melniker, *Termination of Transfers and Licenses Under the New Copyright Law*, 22 N.Y.L.Sch.L.Rev. 589, 602 (1977) (footnote omitted).

Bourne bases its argument largely upon the legislative history of the 1976 Act, wherein Congress referred to the preferred competitive position of the original grantee as "in the nature of a right of 'first refusal.'"[12] This citation to the legislative history is unpersuasive, however, as "it is a well-known canon of construction that the language of the statute is the best indication of legislative intent." *Meltzer v. Zoller*, 520 F.Supp. 847, 855 (D.N.J.1981); *see also United States v. American Trucking Assn's, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 1064, 84 L.Ed. 1345 (1940).

If Congress intended to create a right of first refusal, it would have done so in clear language. Moreover, scholars agree that the congressional description of the competitive advantage enjoyed by the initial grantee as a right of first refusal is not accurate. As the late Professor Nimmer noted, "the original grantee has some advantage over others in obtaining the terminated rights. The House Report refers to this advantage, not entirely accurately, as 'a right of first refusal.'" 3 M. Nimmer, *supra*, § 11.08[A], at 11–45 (footnote omitted); *see also* Stein, *Termination of Transfers and Licenses Under the New Copyright Act: Thorny Problems for the Copyright Bar*, 24 UCLA L.Rev. 1141, 1154 n. 59 (1977) ("Although the Senate and House reports refer to this right as being in the nature of a right of 'first refusal,' this is a somewhat misleading description. It is clear that the Act confers no right upon the current grantee to have the property offered to him first or upon any given terms as a contractual right of first refusal generally connotes") (citations omitted).

Bourne also contends that the invalid Ruby–MPL agreement prevented it from taking advantage of its preferred competitive position to negotiate with Ruby because Stern and MPL had conspired to convince Ruby that she had signed a valid agreement. *See* PTO at 16–17; *see also* [Plaintiffs'] Proposed Findings of Fact and Conclusions of Law at ¶¶ (e)–(i). There is, however, no factual support for this conspiracy claim. Indeed, Bourne admitted at trial that it never attempted to communicate with Ruby to tell her that the deal she made with MPL was unenforceable, or made any attempt to better MPL's offer for the rights in "Cecilia."[13] Having never attempted to do anything to protect its

---

**12.** *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 127, *reprinted in* 1976 U.S.Code Cong. & Admin. News 5659, 5743. The House Report states:

the bill seeks to avoid the situation that has arisen under the present renewal provision, in which third parties have bought up contingent future interests as a form of speculation. [This section] would make a further grant of rights that revert under a terminated grant valid "only if it is made after the effective date of the termination." An exception, in the nature of a right of "first refusal," would permit the original grantee or a successor of such grantee to negotiate a new agreement with the persons effecting the termination at any time after the notice of termination has been served.

*Id.* Although the Report refers to § 203, as noted *supra*, comments on § 203 are equally applicable to § 304. *See Harry Fox Agency, supra*, 543 F.Supp. at 855; *see also supra*, note 7.

**13.** Plaintiff's attorney admitted at trial that Bourne had not attempted to negotiate with Ruby:

The Court: Did you make her a better offer?
Mr. Osterberg: I don't believe we did.

\* \* \* \* \* \*

The Court: ... What you are saying to me is that you did not make any effort to negotiate with Mrs. Stern because you thought you couldn't.
Mr. Osterberg: She made a deal already.
The Court: Did you go to her and say, Mrs. Stern, you made a deal, but it is not valid, it is not enforceable against Ruby, why don't you make a deal with me?
Mr. Osterberg: No, that did not happen.
Tr. at 64–65.

Bourne's failure to advise Ruby that the agreement she had signed with MPL was invalid is strong evidence that Bourne did not itself believe it had a statutory right of first refusal or that its rights under the statute had been otherwise impaired.

so-called preferred position by seeking to negotiate with Ruby, Bourne is in no position to claim that its failure to obtain the renewal right was the result of any conspiracy. The Court, therefore, finds Bourne's damage claim for violation of its so-called statutory right of refusal to be without merit.

## CONCLUSION

The Court grants plaintiffs' request for a declaratory judgment stating that Bourne is the owner of the copyright in the original work "Cecilia," during the extended renewal term, and denies defendants' request for judgment declaring MPL to be the owner of all royalties derived from that original work for the extended renewal term. In addition, the Court denies plaintiff Bourne's claim for damages for the alleged violation of its statutory right of first refusal and for the alleged conspiracy to deprive it of its preferred position under § 304(c) of the copyright laws.

As noted *supra*, in light of these holdings, Bourne's request for a declaratory judgment regarding derivative works is moot. Similarly, the Marx defendants' request for an accounting is denied because the Court has already concluded that Bourne is entitled to all royalties flowing from the extended renewal term. The Court also declines to issue the injunction sought by Bourne. Given the Court's holding, the Court would not expect that MPL will continue to represent that it has any interest in "Cecilia" for the extended renewal term, and Bourne has not suggested otherwise. If MPL continues to make such representations, however, Bourne can reapply to the Court for injunctive relief.

It is SO ORDERED.