OPINION OF THE COURT
 

 Graffeo, J.
 

 We are asked in this dispute to determine whether the renewal of a revolving standby letter of credit is implicitly
 
 *118
 
 contingent on the repayment of funds previously disbursed by the issuing bank.
 

 In September 1994, plaintiff Nissho Iwai Europe PLC agreed to loan $150 million to Daewoo Hong Kong Ltd. in separate installments of $125 million and $25 million. Daewoo was required to pay interest for three years after the first disbursement, to be followed by repayment of principal and accumulated interest in 15 equal quarterly installments of approximately $10.7 million. Daewoo provided two forms of security for the loan, a guarantee by Daewoo’s parent corporation and an irrevocable standby letter of credit issued by defendant Korea First Bank (KFB).
 

 The standby letter of credit, drafted by Nissho, states that KFB opened an “irrevocable revolving letter of credit” in favor of Nissho on behalf of Daewoo for “up to USD 11,500,000.00” to cover any principal and interest that was past due under the Nissho-Daewoo loan agreement. The document further provides that the “letter of credit shall be revolved and reinstated every three months within the period of validity.” The letter of credit was valid from November 3, 1994 “until November 9, 2001, but bee [a] me drawable up to USD 3,750,000.00 from November 9, 1994 until February 9, 1998 and up to USD 11,500,000 from February 10, 1998 until November 9, 2001.” The parties agreed that the instrument would be construed in accordance with New York law and the 1993 version of the International Chamber of Commerce’s Uniform Customs and Practice for Documentary Credits (commonly referred to as the UCP 500).
 

 Daewoo timely repaid its loan from Nissho until it missed the scheduled November 9, 1999 payment of principal and interest. The next day, Nissho notified Daewoo of the default and accelerated the outstanding balance of the loan. Nissho then demanded that KFB cover the late payment pursuant to the letter of credit. KFB complied with that request and transferred about $10.7 million to Nissho. Several weeks later, KFB disbursed $761,171.87 to Nissho, the balance of quarterly funds available under the letter of credit. After these two payments were made, Daewoo’s unpaid principal loan balance was approximately $74 million.
 

 Around the time of the default, rumors began to circulate of KFB’s intention to terminate its operations in the United States, giving rise to concerns about the effect that would have upon the letter of credit. This prompted the Republic of Korea
 
 *119
 
 and the Korea Deposit Insurance Corporation (which control KFB) to notify the New York Superintendent of Banks that the KFB letter of credit provided the beneficiary, Nissho, with a maximum aggregate credit limit of $11.5 million, to be reinstated quarterly in proportion to any payments made by Daewoo. Similar notice was sent to Nissho.
 

 Despite KFB’s interpretation that repayment by Daewoo was necessary before further draws against the letter of credit would be honored, at the beginning of the next quarter (December 1999), Nissho demanded another draw in the amount of $11.5 million. Upon KFB’s refusal to pay, Nissho initiated this action for wrongful dishonor and anticipatory repudiation. Supreme Court granted summary judgment to Nissho, concluding that the letter of credit required that $11.5 million be made available each quarter regardless of Daewoo’s failure to reimburse KFB for previously extended credit. The court awarded Nissho the full amount of principal and interest due on the Daewoo-Nissho loan, approximately $82 million. The Appellate Division affirmed, finding that the quarterly reinstatement of the $11.5 million credit was unconditional and automatic. We granted leave to appeal, and now affirm.
 

 Letters of credit are commercial instruments that provide a seller or lender (the beneficiary) with a guaranteed means of payment from a creditworthy third party (the issuer) in lieu of relying solely on the financial status of a buyer or borrower (the applicant)
 
 (see Centrifugal Casting Mach. Co., Inc. v American Bank & Trust Co.,
 
 966 F2d 1348, 1352 [10th Cir 1992]). Historically, letters of credit have been used to assure predictability and stability in mercantile transactions by diminishing a seller’s risk of nonpayment and a buyer’s risk of nondelivery due to insufficient funds
 
 (see Voest-Alpine Intl. Corp. v Chase Manhattan Bank, N.A.,
 
 707 F2d 680, 682 [2d Cir 1983]). These “commercial” or “documentary” letters of credit are used as a substitute for money in a sales contract; the issuing bank pays the beneficiary upon certification of satisfactory performance in the underlying agreement
 
 (see Centrifugal Casting,
 
 966 F2d at 1350 n 1; Dolan, The Law of Letters of Credit: Commercial and Standby Credits 1.04, at 1-22 [update 2002 no. 1]).
 

 Letters of credit have evolved to serve an additional purpose — to provide security in the event of a default in payment owed under a separate agreement, such as a loan
 
 (see
 
 6B Hawkland UCC Series Rev § 5-101:2, at Rev Art 5-7 — 5-8). A letter of credit serving this objective is referred to as a “standby” letter of credit because it is payable only upon proof
 
 *120
 
 of the applicant’s nonperformance or default
 
 (see Brenntag Intl. Chems., Inc. v Bank of India,
 
 175 F3d 245, 251 [2d Cir 1999]; Dolan, The Law of Letters of Credit H 1.04, at 1-22). Stated another way, a commercial letter of credit substitutes as the primary means of payment, while a standby letter of credit is used secondarily after the beneficiary fails to obtain payment from the applicant
 
 (see Federal Deposit Ins. Corp. v Philadelphia Gear Corp.,
 
 476 US 426, 428 [1986]).
 
 [1]
 

 Both types of instruments are similar in one significant respect — they can “revolve” by periodically replenishing credit lines upon the occurrence of a specified condition or event, thereby allowing the beneficiary to make additional draws in satisfaction of sums still owed by the applicant
 
 (see
 
 Siviglia, Letters of Credit § 14:6, at 14-25; Dolan, The Law of Letters of Credit 1.09, at 1-62). Additionally, because letters of credit depend upon the certainty of payment to the beneficiary, the issuer’s obligation is independent of the rights and liabilities of the parties to the underlying contract; payment must be made irrespective of any allegations of breach of warranty or nonconformity
 
 (see Mennen v J.P. Morgan & Co.,
 
 91 NY2d 13, 20 [1997];
 
 Matter of Supreme Mdse. Co. v Chemical Bank,
 
 70 NY2d 344, 352 [1987]).
 

 Three distinct contractual relationships are usually present when a letter of credit is issued
 
 (see First Commercial Bank v Gotham Originals,
 
 64 NY2d 287, 294 [1985]). There is the underlying agreement between the applicant (here, Daewoo) and the beneficiary (Nissho). The second contractual obligation arises between the issuer (KFB) and its applicant (Daewoo) regarding the terms of the letter of credit and the extent of funds to be made available. Finally, there is the issuance of the letter of credit, the agreement embodying the issuer’s commitment to “honor drafts or other demands for payment presented by the beneficiary or a transfer beneficiary upon compliance with the terms and conditions specified in the credit”
 
 (id.; see e.g. Mennen,
 
 91 NY2d at 20;
 
 Wood v R.R. Donnelley & Sons Co.,
 
 888 F2d 313, 317-318 [3d Cir 1989]).
 

 
 *121
 
 Here, there is no disagreement that KFB issued a revolving standby letter of credit or that Nissho has complied with the requirements of the letter. The focus of the dispute is whether the letter of credit revolves automatically or conditionally. More specifically, do the terms of the letter of credit require that subsequent draws be honored by KFB without regard to repayment by Daewoo, or are future draws contingent on Daewoo’s repayment of funds disbursed during the prior quarter? KFB’s position is that the instrument is unclear as to whether an additional $11.5 million was automatically available at the beginning of each three-month interval or was conditioned upon Daewoo’s repayment of previously utilized credit. It notes that the document does not set forth the total amount of the Nissho-Daewoo loan ($150 million), but refers only to $11.5 million. As a result, KFB maintains that its exposure was limited to the latter amount. Furthermore, although KFB concedes that a repayment condition does not appear in the letter of credit, it nevertheless asserts that the use of the term “revolved” in a standby letter of credit implicitly imposes a duty upon the applicant to reimburse the issuing financial institution for utilized credit before further credit can be renewed and reused by the beneficiary. Consequently, KFB claims that the document is ambiguous because it is susceptible of both interpretations. We disagree.
 

 We have long adhered to the principle that letters of credit must be strictly construed and performed in compliance with their stated terms
 
 (see e.g. United Commodities-Greece v Fidelity Intl. Bank,
 
 64 NY2d 449, 455,
 
 rearg denied
 
 65 NY2d 923 [1985];
 
 Maurice O'Meara Co. v National Park Bank of N.Y.,
 
 239 NY 386, 396-397,
 
 rearg denied
 
 240 NY 607 [1925]). The reason for this rule is rooted in the very purpose of a letter of credit: “[b]y conditioning payment solely upon the terms set forth in the letter of credit, the justifications for an issuing bank’s refusal to honor the credit are severely restricted, thereby assuring the reliability of letters of credit as a payment mechanism”
 
 (Voest-Alpine Intl. Corp. v Chase Manhattan Bank,
 
 707 F2d at 682). Thus, to make an issuing bank’s payment obligation conditional, the parties must clearly and explicitly set forth that requirement on the face of the letter of credit
 
 (see generally Lamborn v National Park Bank of N.Y.,
 
 240 NY 520, 528-529 [1925];
 
 Banque Worms, N.Y. Branch v Banque Commerciale Privee,
 
 679 F Supp 1173, 1180,
 
 affd
 
 849 F2d 787 [2d Cir 1988]). A corollary to these rules, as with all written agreements, is that ambiguity does not arise from
 
 *122
 
 silence, but from “what was written so blindly and imperfectly that its meaning is doubtful”
 
 (Trustees of Freeholders & Commonalty of Town of Southampton v Jessup,
 
 173 NY 84, 90 [1903];
 
 see also Greenfield v Philles Records,
 
 98 NY2d 562 [2002]).
 

 Here, the language of the instrument — this “letter of credit shall be revolved and reinstated every three months within the period of validity” — unequivocally establishes that Daewoo’s credit line of $11.5 million was automatically renewed in relation to time, specifically the beginning of each of the 15 fiscal quarters. Significantly, no conditions are placed upon this cycle of revolution and reinstatement; the letter of credit does not require that Daewoo repay previously utilized credit before KFB renews its credit line. The document also does not expressly limit the aggregate amount of credit that Nissho could draw upon during the entire period of the letter’s validity. Although it is true, as KFB contends, that the instrument refers to a credit limit “up to” $11.5 million rather than the total amount of the Nissho-Daewoo loan, that reference must be read in conjunction with the automatic quarterly renewal period.
 
 [2]
 
 Calculating KFB’s maximum obligation then becomes a simple matter of multiplying $11.5 million by the number of fiscal quarters covered by the letter of credit. Therefore, a literal reading of the instrument, as required by our precedent
 
 (see Matter of Supreme Mdse. v Chemical Bank,
 
 70 NY2d at 352), leads us to conclude that Nissho was entitled to draw up to $11.5 million per quarter under the automatically revolving standby letter of credit irrespective of Daewoo’s failure to reimburse KFB for previous payments made to Nissho.
 
 [3]
 

 We also reject KFB’s suggestion that the term “revolving” inherently preconditions credit renewal upon the ap
 
 *123
 
 plicant’s repayment of funds previously disbursed by the issuer of the letter of credit. That term, as experts for both parties acknowledged, does not have a single accepted definition. Its meaning should be derived from the context in which the term is used
 
 (see
 
 International Standby Practices 1998 [ISP98] rule 1.10 [c] [ii]). A letter of credit can revolve in different ways — in relation to time, value, repayment or the presentation of certain documents — or by a combination of factors, depending upon the language used in the instrument
 
 {see generally,
 
 del Busto, ICC Guide to Documentary Credit Operations for the UCP500, at 48; Givray et al., Survey: Uniform Commercial Code,
 
 Letters of Credit,
 
 46 Bus Law 1579, 1606 [1991] [noting the distinction between “automatic” and “conditional” revolving letters of credit]). Here, viewing the word “revolving” in the context in which it appears in the letter of credit, it is clear that renewal is based upon the passage of time, specifically three months. There is simply no reference in the instrument to repayment by Daewoo.
 

 Furthermore, KFB’s reliance on one sentence in a leading treatise — The Law of Letters of Credit authored by John F. Dolan — is misplaced. Although the treatise’s glossary definition of “revolving credit”
 
 {id.
 
 at G-35) suggests that an issuer is not obligated to honor a subsequent draft until it is reimbursed by the applicant, it is entirely silent on the question of whether such a repayment condition should be implied when it is not explicitly incorporated into the instrument itself. Indeed, the cases cited under the definition address commercial letters of credit involving the sale or delivery of goods which contained express conditions affecting the extension or reinstatement of credit
 
 (see Venizelos, S.A. v Chase Manhattan Bank,
 
 425 F2d 461, 467-468 [2d Cir 1970] [proof that total shipment met minimum weight requirement];
 
 Banco Nacional De Credito Ejidal S.A. v Bank of Am.,
 
 118 F Supp 308, 309-310 [ND Cal 1954] [notice of reinstatement];
 
 Trans-Global Alloy, Ltd. v First Natl. Bank of Lafayette,
 
 490 So 2d 769, 771 [La Ct App, 3d Cir 1986] [deadline for shipment]). In this case, however, the document does not condition the renewal of the credit.
 

 Our policy of strict construction is consistent with the non-documentary conditions doctrine embodied in article 13 of the UCP 500: “[i]f a credit contains conditions without stating the document(s) to be presented in compliance therewith, banks will deem such conditions as not stated and will disregard them” (UCP 500 art 13 [c]). The letter of credit in dispute specifies one document that must be presented along with the sight
 
 *124
 
 draft drawn on the letter — a signed statement by Nissho attesting that (1) the amount drawn on the letter equals the amount of principal and interest that was past due on the Daewoo-Nissho loan, (2) Daewoo had not satisfied its past due obligation and (3) funds received from KFB would be used to satisfy Daewoo’s outstanding balance. The instrument requires nothing further; it does not call for Nissho to supply proof that Daewoo repaid KFB for the previous quarter’s credit, nor does it make KFB’s credit obligation to Nissho contingent on reimbursement from Daewoo covering prior draws.
 

 Finally, we recognize that a repayment schedule is absent from the instrument in this case and that a borrower’s duty to reimburse is necessarily implied in any credit transaction
 
 (see e.g.
 
 UCC 5-108 [i] [1]; Dolan, The Law of Letters of Credit 1.09, at 1-62; Dole,
 
 Warranties by Beneficiaries of Letters of Credit under Revised Article 5 of the UCC: The Truth and Nothing but the Truth,
 
 39 Hous L Rev 375, 379-380 [2002]). However, to construe that implicit understanding as a prerequisite to the renewal of Daewoo’s credit line would require us “to read into the letter of credit something which is not there”
 
 (Maurice O’Meara Co. v National Park Bank of N.Y.,
 
 239 NY at 397) and to condition unambiguous, explicit terms with an unwritten requirement. This we decline to do.
 

 We have examined KFB’s remaining contentions and conclude that they lack merit.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . The importance of letters of credit in international trade and financing cannot be overstated. At least five separate sets of model laws have been promulgated to govern their use: (1) article 5 of the Uniform Commercial Code, (2) the Uniform Customs and Practice for Documentary Credits (UCP 500), (3) the United Nations Convention on Independent Guarantees and Standby Letters of Credit, (4) the Uniform Rules for Demand Guarantees, and (5) the International Standby Practices 1998 (ISP98) (see Dolan,
 
 Analyzing Bank Drafted Standby Letter of Credit Rules, The International Standby Practice [ISP98],
 
 45 Wayne L Rev 1865, 1867 [2000]).
 

 [2]
 

 . By contrast, the letter of credit in
 
 Philadelphia Gear Corp. v Federal Deposit Ins. Corp.
 
 (751 F2d 1131, 1139-1140 [10th Cir 1984],
 
 revd
 
 476 US 426 [1986]), which was determined to be ambiguous regarding the aggregate amount of available credit, lacked a definitive time frame for renewal or any other way of determining the amount ultimately due.
 

 [3]
 

 . KFB’s contention that this interpretation is unreasonable because it produces a potential cumulative $221 million credit liability is not persuasive. The record evidence reveals that the total amount of the Nissho-Daewoo loan was over $220 million (including interest), the contract for that loan was specifically referenced in the letter of credit and the purpose of the letter of credit was to guarantee the loan (see
 
 Reiss v Financial Performance
 
 Corp., 97 NY2d 195, 200 [2001]). Given these facts, it seems unlikely that the parties intended this source of security to be limited to five percent of the loan’s value in the event of a default.