[770 NYS2d 40]

In the Matter of the Estate of IGOR STRAVINSKY, Deceased. CHESTER MUSIC LTD., Respondent; SCHOTT MUSIK INTERNATIONAL GMBH & Co.; Appellant-Respondent, DENISE STRAWINSKI et al., Respondents-Appellants.

First Department, December 30, 2003

## APPEARANCES OF COUNSEL

*Katten Muchin Zavis Rosenman (Arthur S. Linker* and *Joshua S. Rubenstein* of counsel), for respondent.

*White & Case LLP (Carol A. Witschel* and *I. Fred Koenigsberg* of counsel), for appellant-respondent.

*Windels Marx Lane & Mittendorf, LLP* and *Foley & Lardner (James D. Dasso, Fred M. Ackerson, Therese C. King* and *John M. Kriz* of counsel), for respondents-appellants.

## OPINION OF THE COURT

NARDELLI, J.P.

In this appeal, we are asked to review an order and subsequent counterdecree of the Surrogate's Court, New York County, which, inter alia, interpreted a certain provision in a stipulation of settlement entered into by the executors and heirs of the estate of the late, renowned composer Igor Stravinsky, in order to settle disputes arising out of the distribution of the corpus of the composer's estate.

The salient facts of this matter are not in dispute.

Igor Stravinsky died on April 6, 1971 and his last will and testament (the Will) was admitted to probate in the Surrogate's Court, New York County. The Will directed that Stravinsky's entire estate be put in trust for the income benefit of his surviving wife, Vera, with the requirement that all of the net income of the trust be paid to her or for her benefit at least annually. The Will further provided that upon Vera's death, the trust would terminate and the remaining principal would be divided into nine equal shares, with two shares being distributed to each of the composer's four issue by his first marriage,[1] children Theodore, Soulima and Milene, and granddaughter Catherine, the issue of a predeceased daughter.[2] The ninth remaining interest was bequeathed to Stravinsky's musical assistant and long-time friend and companion, Robert Craft. The corpus of the trust consisted primarily of the composer's interest in his

---

[1]. Stravinsky's first wife, Catherine, died in Paris, France in 1939 after a long illness with tuberculosis.

[2]. Stravinsky's daughter, Ludmilla, also died in Paris, France from tuberculosis in 1938.

copyrighted works, which included his right to receive royalties from the exploitation of those works. The Will named Vera as coexecutor with L. Arnold Weissberger, who was also appointed the sole trustee of Vera's trust.

The composer's executors accounted in 1975, which resulted in several "bitter" disputes between Vera and the composer's issue. The focal point of the discord among the parties was Vera's claim that in addition to her income interest under the Will, she was entitled to an absolute 40% community property interest in all of Stravinsky's assets. Vera's claim was based on the contention that the composer created many of his works while he and Vera resided in California, a community property state. The composer's issue, some of whom resided in France, maintained that under French law, they were entitled to an outright forced share from their father's estate pursuant to the applicable French statutes.

The parties, after four years of litigation and extensive negotiations conducted during the summer of 1979, reached a compromise which was embodied in a stipulation of settlement (the Stipulation) entered in open court before Surrogate Millard L. Midonick on October 9, 1979. Paragraph 1 of the Stipulation, the interpretation of which is at the core of this appeal, provides:

> "Vera DeBasset Stravinsky is and will continue during her lifetime to be the owner of a community property interest of 38.93% *in all royalties* from the works of Igor Stravinsky, except for those arising in France and certain countries which are to be paid to the Issue, and except as to those from the works of Igor Stravinsky entering the renewal term in the United States after the death of Igor Stravinsky which are the subject of a separate prior agreement. At the death of Vera DeBasset Stravinsky, her community property interest *in such royalties* shall be 20%, and such 20% shall be indefeasibly vested and shall pass by operation of law to her legal representatives or to her heirs at law as the case may be."
> (Emphasis added.)

The Stipulation, executed by the coexecutors, Vera in her individual capacity, the composer's issue and Robert Craft, further directed that any disputes arising out of the enforcement of the Stipulation were to be submitted to the Surrogate's Court, New York County.

A second stipulation, also entered before Surrogate Midonick on October 9, 1979, disposed of litigation in France (the French

Stipulation), in which the issue had successfully pursued a forced heirship claim under French law to the extent that a French court temporarily restrained the payment of royalties from works copyrighted in France. The French Stipulation provided, in pertinent part, that all French royalties were to be paid to the issue until the termination of the trust, upon Vera's death, and then the New York Stipulation was to control the payment of French royalties.

It is readily apparent that at the time the stipulations were entered into, all the parties were aware that, pursuant to the provisions of the British Copyright Act of 1911, as well as similar statutes in other British Commonwealth countries, the composer's assignments of copyrights, other than by will, executed between July 1, 1912 and July 1, 1957 would, by operation of law, terminate 25 years after the composer's death, i.e., in 1996, and would revert to his estate (the reversionary copyrights).

Vera Stravinsky died in September 1982 and, in her last will and testament, left the entire residue of her estate, including her 20% share of the royalties, as provided in the Stipulation, to Robert Craft. Vera's death also triggered the termination of the trust, and the ownership of the assets comprising the principal of the trust, Stravinsky's copyrighted works, passed to the remaindermen, eight ninths to the composer's issue and one ninth to Robert Craft.

A dispute subsequently arose between the composer's issue and the executor of Vera's estate as to whether the phrase "such royalties," as set forth in paragraph 1 of the Stipulation, included or excluded the French royalties. Surrogate Roth, in a decision dated June 4, 1987, held that Vera's estate was entitled to 20% of "all royalties, including those from France" based upon the "plain meaning of the quoted paragraph and the history of the negotiations."

The composer's issue thereafter assigned their respective interests in the reversionary copyrights to petitioner Chester Music Ltd. (Chester) pursuant to music publishing agreements under which Chester agreed to pay royalties to the composer's issue. Robert Craft likewise assigned his one-ninth interest in the reversionary copyrights and his 20% interest, as Vera's heir,

in royalties from those reversionary copyrights, to respondent Schott Musik International GmbH & Co. (Schott).[3]

Chester, in 1999, commenced the within proceeding, again seeking clarification of the term "such royalties" as set forth in paragraph 1 of the Stipulation, but this time such clarification was sought regarding the term's application to the current reversionary copyrights. Chester maintained that "such royalties" was not intended to include royalties from copyrights that reverted to the composer's estate after the Stipulation was executed, i.e. the British copyrights; and that the term royalties in the context of the Stipulation was designed only to include the revenue payable to the writer under a publishing agreement (the writer's share), and not the total revenue emanating from the exploitation of the copyrighted works, including, in addition to the writer's share, the amount of compensation to which the publisher is entitled (the publisher's share) for exploiting the works.

Conversely, Schott, in possession of Craft's one-ninth interest in the copyrighted works, plus the 20% interest in the royalties bequeathed by Vera to Craft, maintained that the term "such royalties," when applied to the reversionary copyrights, included not only the writer's share, but the publisher's share as well. Schott, in its view, believed that it was entitled to a 28.89% interest in the reversionary copyrights, equal to 20% of all the royalties (both publisher's and writer's shares), plus one ninth of the remaining 80%.

The composer's issue subsequently joined the fray and argued that the plain language of the British Copyright Act of 1911 vests complete ownership of the reversionary copyrights according to the terms of the composer's will, eight ninths in the composer's issue (Chester's share) and one ninth in Craft (Schott's share), and such ownership is not burdened by Schott's additional 20% interest in the royalties.

The Surrogate's Court, in a decision and order entered on or about August 8, 2001, held: that the phrase "such royalties" referred to all royalties, including those derived from the reversionary copyrights; and that "royalties" denotes only the writer's portion of those royalties. We agree and affirm.

Initially, we note that the composer's issue, on appeal, almost entirely disregard the Surrogate's Court's analysis, which

---

**3.** Chester Music Ltd. is a music publisher based in London, England, and Schott Musik International GmbH & Co. is a music publisher based in Mainz, Germany.

employed basic principles of contract interpretation, and instead focus on the provisions of the British Copyright Act of 1911. The Act provides, in pertinent part, that:

> "[w]here the author of a work is the first owner of the copyright therein, no assignment of the copyright, and no grant of any interest therein, *made by him* (otherwise than by Will) after the passing of this Act, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal personal representatives as part of his estate, *and any agreement entered into by him as to the disposition of such reversionary interest shall be null and void . . . .*" (Emphasis added.)

In the first instance, we find it abundantly clear from a plain reading of the British Copyright Act that it addresses only those assignments *made by the author*, and does not, in any manner, impact agreements made among the author's heirs as to how they choose to apportion the reversionary copyrights among themselves.

Secondly, and most importantly, the Stipulation does not dispose of, or grant ownership in the reversionary copyrights at all, but instead provides a schematic by which a percentage of the royalties generated by those copyrights is to be allocated among the composer's heirs. Indeed, this point is implicitly conceded by the composer's issue, who state that "[i]t is clear that the parties intended only to settle their dispute of the allocation of royalties and management of Vera's trust and did not disturb the plan for copyright ownership established by Stravinsky's will." Accordingly, since the Stipulation was not "made by" the author, and did not vest any rights in the reversionary copyrights in any event, we must conclude that the British Copyright Act is inapplicable to the facts herein.

The Court of Appeals, in *Mitchell v New York Hosp.* (61 NY2d 208 [1984]), observed that "courts have long favored and encouraged the fashioning of stipulations as a means of expediting and simplifying the resolution of disputes. . . . We have repeatedly held that, unless public policy is affronted, parties to a civil dispute are free to chart their own litigation course" (*id.*

at 214; *see also Matter of Hofmann*, 287 AD2d 119, 122 [2001]; *Jones Lang Wootton USA v LeBoeuf, Lamb, Greene & MacRae*, 243 AD2d 168, 180 [1998], *lv dismissed* 92 NY2d 962 [1998]; *Lozada v Build On Top, HDFC*, 266 AD2d 63, 65 [1999]). A valid stipulation, a point not contested by the parties herein, should be construed as an independent contract subject to the well-settled principles of contractual interpretation (*McCoy v Feinman*, 99 NY2d 295, 302 [2002]; *Weinstock v Handler*, 254 AD2d 165, 168 [1998]; *Matter of Rebell v Trask*, 220 AD2d 594, 596-597 [1995]).

It is also well settled that the issue of whether an agreement is ambiguous is a question of law for the courts (*see W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]; *Van Wagner Adv. Corp. v S & M Enters.*, 67 NY2d 186, 191 [1986]; *Christian, Podleska, & Van Musschenbroek v Goldman, Sachs & Co.*, 203 AD2d 9, 10 [1994], *lv dismissed* 85 NY2d 830 [1995]), and ambiguity is to be determined by looking within the four corners of the document and not to outside sources (*Kass v Kass*, 91 NY2d 554, 566 [1998]; *W.W.W. Assoc. v Giancontieri, supra* at 162-163). In *William C. Atwater & Co. v Panama R.R. Co.* (246 NY 519, 524 [1927]), the Court of Appeals opined, in an oft-quoted passage:

" 'Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions *without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.*' [Citations omitted.] The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. *Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.* Form should not prevail over substance and a sensible meaning of words should be sought" (*id.* at 524 [emphasis added]; *see e.g. Kass v Kass, supra* at 566; *Bijan Designer For Men v Fireman's Fund Ins. Co.*, 264 AD2d 48, 51-52 [2000], *lv denied* 96 NY2d 707 [2001]; *Republic Natl. Bank of N.Y. v Zimmcor U.S.A. Corp.*, 203 AD2d 107, 111 [1994]; *S & S Media v Vango Media*, 84 AD2d 356, 359 [1982]; *Zodiac Enters. v American Broadcasting Cos.*, 81 AD2d 337, 339 [1981], *affd* 56 NY2d 738 [1982]; *Terwilliger v Terwilliger*, 206 F3d 240, 245 [2000]).

Justice Learned Hand, in a concurring opinion, summarized the foregoing in the following manner, "[t]here is no surer way to misread any document than to read it literally" (*Guiseppi v Walling*, 144 F2d 608, 624 [1944], *affd* 324 US 244 [1945]).

It must also be borne in mind that a court should construe a stipulation made in open court in accordance with the intent of the parties, as well as the purpose of the stipulation, by examining the record as a whole (*see Simmons v Simmons*, 305 AD2d 661 [2003]; *Pollack v Pollack*, 288 AD2d 201 [2001]; *Iacobacci v McAleavey*, 222 AD2d 406, 407 [1995]).

In the matter before us, we find that the Surrogate's Court properly concluded, based upon the plain language of the Stipulation, that the term "such royalties" was intended to include royalties from the reversionary copyrights. The Stipulation specifically excepted from the phrase "all royalties" only: (1) those arising in France, which were to be paid to the composer's issue; and (2) royalties from United States copyrights entering their renewal terms after the composer's death, and made no provision for the reversionary copyrights, which all of the parties were aware would soon devolve to the composer's estate. Had the composer's issue desired to limit the royalties to which Vera (and now Schott) was to be entitled, such language should have been specifically set forth in the Stipulation (*see Greenfield v Philles Records*, 98 NY2d 562, 571 [2002], quoting *Boosey & Hawkes Music Publs., Ltd. v Walt Disney Co.*, 145 F3d 481, 487 [1998] [" '(T)he party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation' "]; *Nissho Iwai Europe v Korea First Bank*, 99 NY2d 115, 121-122 [2002], quoting *Trustees of Freeholders & Commonalty of Town of Southampton v Jessup*, 173 NY 84, 90 [1903] ["'(A)mbiguity does not arise from silence, but from 'what was written so blindly and imperfectly that its meaning is doubtful' "]; *see also Matter of Goldstein v Plotnicki*, 301 AD2d 483, 484 [2003]).

In addition, the Surrogate's Court also correctly noted that the court record of the negotiations leading to the execution of the Stipulation indicates that the parties intended the Stipulation to govern royalties from all of the composer's copyright interests other than the two exceptions discussed above. The court record, therefore, supports the Surrogate's finding.

The composer's issue's reliance on *Bourne Co. v MPL Communications, Inc.* (675 F Supp 859 [1987]) is misplaced. The

*Bourne* court addressed the purported assignment of copyrights during the extended renewal period set forth in the United States Copyright Act of 1976 (17 USC § 304). The statute provides, inter alia, that the author, or his/her statutory successor, may terminate a transfer of a pre-existing copyright after its 56th year, or at the beginning of its 19-year extended renewal term (17 USC § 304 [c] [3]). The assignment in *Bourne* was made by the beneficiary of the estate of the author's widow, who was his statutory successor. The *Bourne* court found the widow's previous assignment of her rights after exercising her right of termination to be invalid because a new assignment, prior to the termination of the old, ran afoul of the statutory goal of prohibiting a transfer of the copyright to a person other than the grantee prior to the effective date of termination.

In addition to the fact that the ground upon which the *Bourne* court ruled is not relevant herein, there is also no similar derogation of the British Copyright Act under the facts at bar, as the Stipulation does not alter the ownership of the copyrights, but merely governs the respective royalty interests of the composer's successors, among themselves, after his death. We find no merit in, or support for, the composer's issue's argument, raised for the first time on appeal, that Vera's interest does not attach to the British reversionary interest as a matter of law. In any event, the Stipulation does not, in any manner, undercut the purpose of the British Copyright Act, which was to prohibit the author from alienating the reversionary copyrights.

Finally, we agree with the Surrogate's Court that "royalties," as set forth in the Stipulation, refers only to the writer's share of the royalties. "In the absence of the tender of extrinsic evidence to establish otherwise, the court establishes the meaning of the provision in question from within the four corners of the agreement and the general circumstances of the relation between the parties, including the subject matter of the agreement" (*Bensons Plaza v Great Atl. & Pac. Tea Co.*, 44 NY2d 791, 793 [1978]; *Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285, 290-291 [1973]; *Becker v Peter A. Frasse & Co.*, 255 NY 10, 14 [1930]).

At the time the Stipulation was drafted and executed, the parties were in a position to allocate only those royalties accruing to the composer, i.e., the writer's share, and the parties, since that time, have continued to stand in such passive relationship to the royalties, including the royalties arising from the reversionary copyrights. Indeed, as noted by the Surrogate's

Court, the term royalties "could not have been intended to include the publisher's share unless the parties intended to do the implausible, i.e., to divide among themselves a greater sum than they together would actually receive."

We find without merit Schott's contention that the Surrogate's Court's decision created a third exception to the royalties paid to Vera's estate, as it simply determines how the royalties are to be calculated. Nor is the Surrogate's Court's determination inconsistent with the purpose of the reversionary law, which is to give the heirs a new opportunity to exploit the copyrights, as the heirs, upon reversion, were, and still are, free to negotiate new publishing agreements.

Schott, in effect, is arguing that Vera's estate's royalty interest should increase 50% in value upon reversion since it would no longer have to bear the burden of the cost of exploiting the work, as that cost should fall solely on the copyright owner. Schott, therefore, is contending that the assignee of the royalty interest is entitled to substantially more than the owner of the underlying copyright, a position we reject as without any basis in the Stipulation, in the "general circumstances of the relation between the parties" (see Bensons Plaza v Great Atl. & Pac. Tea Co., supra at 793), or in logic.

Accordingly, the order of the Surrogate's Court, New York County (Renee Roth, S.), entered on or about August 8, 2001, and the counterdecree, same court and Surrogate, entered thereon on or about September 17, 2001, which held, inter alia, that the term royalties, as set forth in the Stipulation, included the copyrights which reverted to the composer's estate pursuant to the British Copyright Act of 1911, and that royalties only referred to the writer's share of the royalties, should be affirmed, without costs.

ANDRIAS, SAXE, WILLIAMS and MARLOW, JJ., concur.

Order, Surrogate's Court, New York County, entered on or about August 8, 2001, and counterdecree, same court, entered on or about September 17, 2001, affirmed, without costs.