Skanska USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC (2016 NY Slip Op 06903)





Skanska USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC


2016 NY Slip Op 06903


Decided on October 20, 2016


Appellate Division, First Department


Acosta, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on October 20, 2016
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta, J.P.
David B. Saxe
Judith J. Gische
Troy K. Webber
Marcy L. Kahn, JJ.


652680/14 

[*1]Skanska USA Building Inc., Plaintiff-Appellant-Respondent,
v
Atlantic Yards B2 Owner, LLC, et al., Defendants-Respondents-Appellants, ABC Companies, LLC, et al., Defendants. _ _ _ _ _ Associated General Contractors of NYS, LLC, Amicus Curiae.



Cross appeals from the order of the Supreme Court,
New York Country (Saliann Scarpulla, J.), entered July 20, 2015, which, insofar as appealed from as limited by the briefs, granted defendants-respondents' motion to dismiss subparts (f) and (h) of the first cause of action and denied the motion as to subparts (a), (b), and (c) of that cause of action and as to the third cause of action, and denied plaintiff's motion to disqualify the law firm of Troutman Sanders LLP as defendants' attorneys.



Peckar & Abramson, P.C., New York (Bruce D. Meller and Peter E. Moran of counsel), for appellant-respondent.
Kramer Levin Naftalis & Frankel LLP, New York (Harold P. Weinberger, Nathan M. Hammeerman and Kaavya Viswanathan of counsel), and Troutman Sanders LLP, New York (Lee W. Stremba, Aaron Abraham and Kevin P. Wallace of counsel), for respondents-appellants.
Couch White, LLP, Albany (Jennifer K. Harvey and Joel M. Howard, III of counsel), for amicus curiae.



ACOSTA, J.P.


This case gives us the opportunity to interpret the language of Lien Law § 5, which provides that a private developer on public land must post a bond or other undertaking guaranteeing prompt payment to the contractor. We also address piercing the corporate veil in litigation involving sophisticated entities, as well as several breach of contract claims and attorney disqualification. These issues arose in the context of construction litigation between plaintiff and its affiliates, an international construction conglomerate, and defendants Atlantic Yards B2 Owner LLC (B2 Owner) and Forest City Ratner Companies, LLC (Forest City) and their affiliates, the developers of the Atlantic Yards project in Brooklyn. Specifically, the litigation revolved around the construction of a high-rise residential tower called "B2." B2 was to be built using innovative prefabricated modular units developed by defendant Forest City that would then be stacked together by plaintiff to form the high-rise. For the reasons stated below, we decline to adopt plaintiff's interpretation that Lien Law § 5 is satisfied by the posting of a bond only and not a guarantee as was done here. We also find that plaintiff failed to plead a veil-piercing claim. As the facts show, both parties were very sophisticated, and negotiated in minute detail all aspects of their agreements to build B2 using innovative technology. That the project failed does not lead to a veil-piercing claim, especially since plaintiff failed to identify the alleged fraud or other wrongdoing. We also reinstate the claim based on inadequate factory and labor, and decline to disqualify one of defendants' law firms based on a conflict of interest. Background
In July 2006, the Empire State Development Corporation (ESDC), a state actor, adopted a plan for the Atlantic Yards Land Use Improvement and Civil Project, a 22-acre mixed-use development project in Brooklyn, to be anchored by the Barclay Center sports arena. As part of this project, in March 2010, ESDC entered into an interim lease agreement with AYDC Interim Developer, LLC, an entity affiliated with defendant B2 Owner, for construction of a number of buildings near the Barclays Center sports arena.
One of these buildings, the B2 Residential Project (B2 Building), was a proposed 34-story residential building containing 350 units. The B2 Building was to be erected with innovative modular construction, i.e., assembled pre-manufactured modular units. The modular construction concept was based on proprietary technology and design developed by defendant Forest City, also an affiliate of B2 Owner.
Forest City invited plaintiff, an international construction conglomerate, to participate in establishing a factory to construct the modules near the B2 site, and then to assemble the modules into the B2 Building. In June 2012, plaintiff and FCRC Modular, LLC (a Forest City affiliate) entered into a "Contract for Module Fabrication and Testing Services" (the Testing Agreement). The Testing Agreement contemplated a joint effort by plaintiff and the Forest City entities to build and test the modular units to be used in the B2 Building, with the goal of entering into a joint venture for construction of a full-blown modular factory facility.
On October 31, 2012, affiliates of plaintiff and Forest City executed three agreements in furtherance of the B2 Project. FCRC Modular, Skanska Modular, LLC (a daughter company of plaintiff), together with (as to certain portions) plaintiff and B2 Owner, entered into an "LLC Agreement" establishing FC+Skanska Modular, LLC (FC Skanska), to build and operate the modular factory. The LLC Agreement was, in sum, a joint venture among the parties, wherein Forest City affiliates supplied the modular unit intellectual property (including the fruits of the Testing Agreement), plus some capital, and plaintiff's affiliates supplied capital and construction know-how. The LLC Agreement made Skanska Modular the managing member for purposes of [*2]day-to-day operations.
On the same day, FCRC Modular, Skanska Modular, and FC Skanska entered into an "Intellectual Property Transfer and Development Agreement" (IP Transfer Agreement), which conveyed the modular IP and fruits of the Testing Agreement to FC Skanska.
Finally, also on October 31, 2012, plaintiff and B2 Owner entered into a "Construction Management and Fabrication Services Agreement" (the CM Agreement). The CM Agreement provided for plaintiff to enter into a subcontract with FC Skanska, under which FC Skanska would supply the modular units and plaintiff would effect the assembly, in exchange for a contract price of $116,875,078.
Among its other provisions, the CM Agreement called for the B2 Project to be substantially completed 416 business days after B2 Owner issued a "Notice to Proceed." In the CM Agreement, plaintiff represented that it had conducted due diligence and had no reason to believe that the modular design was inadequate or would not permit construction as provided for in the CM Agreement. On the other hand, the CM Agreement recited that plaintiff could "rely upon and use" in its performance "information supplied to it by or on behalf of [B2] Owner and its [a]ffiliates." The CM Agreement further stated that plaintiff was "not responsible for defects and/or deficiencies in the Work attributable to [its] reliance upon any such information that is incorrect, inaccurate or incomplete," and provided further that plaintiff would "notify [B2] Owner promptly of any inaccuracies in such information . . . so as to minimize potential delays."
The CM Agreement contemplated changes to the schedule for "Force Majeure Event[s]," "Owner-Caused Event[s]," and "Contractor-Caused Delay[s]." Plaintiff was entitled to extensions of time for Force Majeure and Owner-Caused Events, but only if it gave written notice within five days of its actual knowledge of the event, followed by a second notice within 45 days after the end of the event (or the initial notice). Moreover, time extensions were only available for events that "adversely impact[ed] activities on the critical path" of the construction schedule. The CM Agreement similarly provided for plaintiff to receive additional payment for Force Majeure or Owner-Caused Events if it gave timely notice.
B2 Owner could also request or direct changes in the scope of work. Either plaintiff or B2 Owner could terminate the CM Agreement for cause. B2 Owner could also terminate the CM Agreement for convenience. B2 Owner issued the Notice to Proceed on December 14, effective December 21, 2012. The deadline for substantial completion was July 25, 2014.
By a 146-page letter dated August 8, 2014, plaintiff gave B2 Owner notice of its intent to terminate the CM Agreement on account of dozens of alleged Force Majeure and Owner-Caused Events and other breaches. The letter specified 12 alleged periods of delay, each lasting between one week and as much as five months. Plaintiff attributed the delays to delays in the factory fit-out (i.e., the time to get the modular factory up and running); defects in Forest City's modular unit design technology; related negligence and failure to cooperate by B2 Owner's design professionals; and improper changes to the scope of work made by B2 Owner without the requisite change orders. Plaintiff also alleged that Forest City had breached the CM Agreement's requirement that it provide evidence of satisfactory financing for the project by, among other things, failing to post a bond required by Lien Law § 5. Plaintiff alleged that it had suffered damages in excess of $50 million.
On August 27, 2014, plaintiff stopped work on the project and shortly thereafter notified B2 Owner that the CM Agreement was terminated. Complaint & Dismissal Motion
Plaintiff commenced this action asserting causes of action for breach of the CM Agreement. It claimed that defendants had breached the CM Agreement by, among other things, providing a defective design for the project, including an inadequately designed modular factory facility with inadequate labor, changing the project scope without issuing change orders, and [*3]failing to provide adequate security as required by the Lien Law. Plaintiff also asserted a cause of action alleging that B2 Owner was a mere alter ego of Forest City, and seeking to pierce Forest City's corporate veil. Plaintiff sought damages of at least $30 million.
Defendants moved pursuant to CPLR 3211(a)(1) and (7) to dismiss the veil-piercing cause of action, as well as certain parts of plaintiff's breach of contract claims, including the claims that defendants violated Lien Law § 5, supplied a defectively designed modular factory and inadequate factory labor, and changed the project scope without appropriate change orders.
Plaintiff opposed the motion and cross-moved pursuant to CPLR 3211(c) for partial summary judgment on the issue of defendants' liability on the Lien Law § 5 claim. Attorney Disqualification Motion
Plaintiff also moved to disqualify the law firm Troutman Sanders LLP (Troutman) as defendants' attorneys, on the ground of conflict of interest, inasmuch as Troutman represented two of plaintiff's affiliates in matters in Maryland and Florida. Plaintiff added that Troutman's representation of Forest City was adverse to the interests of one of its affiliate's directors, who was a named defendant in a related action in Supreme Court, New York County, brought by FCRC Modular. Court's Decision on the Motion
The motion court dismissed subpart (f) of the first cause of action, which alleges that defendants breached the CM Agreement by failing to post a bond required under Lien Law § 5, and subpart (h), which alleges breach of the CM Agreement based on an inadequate factory and inadequate labor.
The motion court denied defendants' motion to dismiss subparts (a) and (b) of the first cause of action, which alleges breach of contract due to design defects, as well as subpart (c), which alleges breach of the parties' CM Agreement by improperly changing the scope of work. It also declined to dismiss the third cause of action, which seeks to pierce the corporate veil of defendants and their affiliates, and denied plaintiff's motion to disqualify Troutman. Analysis Lien Law § 5
Plaintiff argues that the text and legislative history of Lien Law § 5 demonstrate that Forest City Ratner Companies, LLC (FCRC) was required to post a bond to guarantee B2 Owner's performance under the CM Agreement. We disagree. Far from supporting plaintiff's argument, the statute's legislative history indicates that no bond — as opposed to some other sort of "undertaking," such as a guarantee — was required to be posted here.
Lien Law § 5, entitled "Liens under contracts for public improvements," provides, in relevant part:
"Where no public fund has been established for the financing of a public improvement with estimated cost in excess of two hundred fifty thousand dollars, the chief financial officer of the public owner shall require the private entity for whom the public improvement is being made to post, or cause to be posted, a bond or other form of undertaking guaranteeing prompt payment of moneys due to the contractor, his or her subcontractors and to all persons furnishing labor or materials to the contractor or his or her subcontractors in the prosecution of the work on the public improvement" (emphasis added).
The statute dates back to the former Lien Law of 1897. Prior to 2004, the statute left a "gap," in that contractors working on projects being built by private developers, with private [*4]funds, but on public land, could not file liens against the public land or the private entity's leasehold interest (see Matter of Paerdegat Boat & Racquet Club v Zarrelli, 57 NY2d 966 [1982], revg for reasons stated at 83 AD2d 444, 449-452 [2d Dept 1981] [Hopkins, J., concurring in part, dissenting in part]; Plattsburgh Quarries v Markoff, 164 AD2d 30, 32 [3d Dept 1990], lv denied 77 NY2d 809 [1991]).
In 2004, the legislature acted to fill this gap by enacting the language highlighted above. This provides for the public owner, in the case of large private development projects on public land, to "require the private entity for whom the public improvement is being made to post, or cause to be posted, a bond or other form of undertaking guaranteeing prompt payment of moneys due to the contractor . . . in the prosecution of the work on the public improvement" (L 2004, ch 155, § 1).
The crux of plaintiff's position is that the guarantee provided in this case does not comply with the law because it is not equivalent to a bond or "other form of undertaking" under the statute.
A statute, however, is to be construed so as to give meaning to each word (see McKinney's Statutes § 231). Black's Law Dictionary defines an "undertaking" first as "[a] promise, pledge, or engagement," and second as "[a] bail bond" (Black's Law Dictionary 1665 [9th ed 2009]). Similarly, the CPLR defines "Undertaking" first as "[a]ny obligation, whether or not the principal is a party thereto, which contains a covenant by a surety to pay the required amount, as specified therein, if any required condition . . . is not fulfilled" (CPLR 2501[1]). Hence, an "undertaking," as distinct from a "bond," is simply a "formal promise [or] guarantee" (Black's Law Dictionary 1665 [9th ed 2009]).
That the legislature intended the term "undertaking" in Lien Law § 5 to mean a "guarantee" is strongly supported by the statute's legislative history, which indicates that the Governor vetoed an earlier version of the 2004 amendment that added the above quoted language because the earlier version would have required the posting of a bond in every instance, disallowing "other forms of security designed to guarantee payment" (Letter from Assembly sponsor, July 8, 2004, Bill Jacket, L 2004, ch 155 at 5). The senate sponsor of the amendment clarified that the phrase "or some other form of undertaking" was added to meet the Governor's concerns by providing "an alternative to posting a bond" (Letter from Assembly sponsor, July 15, 2004, Bill Jacket, L 2004, ch 155 at 3).
As defendants point out, ESDC met its obligations under the statute by causing a Forest City affiliate — Forest City Enterprises, Inc. — to issue a formal "Guaranty" that B2 Owner would "cause Substantial Completion of the Improvements and perform the Development Work," including "to fully and punctually pay and discharge any and all costs, expenses and liabilities incurred for or in connection with the Guaranteed Work, including, but not limited to, the costs of constructing, equipping and furnishing the Guaranteed Work" (emphasis added). This guarantee follows the letter of the statute, namely "guaranteeing prompt payment" to contractors. That there are better guarantees available, such as a letter of credit, as the dissent notes, is beside the point. ESDC, as the public owner, was satisfied with the guarantee issued by Forest City Enterprises, Inc. Certainly, if the legislature had wanted the guarantee to be on par with a letter of credit it could have said that or identified the various types of guarantees that would satisfy the statute.
Since plaintiff is seeking only to force defendants to post a bond under Lien Law § 5, we need not decide whether it would have standing to enforce the guaranty as against Forest City Enterprises, as a third-party beneficiary. Breach of Contract Factory Facility and Labor
The motion court erred in dismissing subpart (h) of the first cause of action, which alleges [*5]breach of the CM Agreement based on an inadequate factory and inadequate labor. Plaintiff plausibly argues that the CM Agreement, particularly when viewed together with the parties' related and contemporaneously executed LLC and IP Transfer Agreements (see BWA Corp. v Alltrans Express U.S.A., 112 AD2d 850, 852 [1st Dept 1985]), required B2 Owner to ensure that an adequate modular factory and factory labor force were in place before it issued the Notice to Proceed. Thus, the allegations that the factory and labor force were inadequate, causing project delays, adequately state a claim for breach of the CM Agreement.
Modular Unit Design Defects
The motion court upheld the claim that defendants breached the CM Agreement by providing defectively designed modular unit technology. Defendants argue that this claim is refuted by documentary evidence. Defendants' argument lacks merit.
CM Agreement § 5.4(b)(ii) defines an "Owner-Caused Event" as including "fault, neglect or other negligent or wrongful act or failure to act by [B2] Owner's . . . Design Professionals." The CM Agreement makes clear that defendants designed the modular unit technology. Indeed, B2 Owner expressly represented that its professionals designed the modules and they were "sufficient for completion of the Work." Plaintiff alleges that the modular units, designed by defendants or their agents, were defective. Plaintiff thereby states a claim for breach of the CM Agreement.
Defendants' main argument is that plaintiff failed to provide timely notice as required to assert a claim for design defect under section 3.5 of the LLC Agreement, i.e., by December 7, 2012. However, the parties appear to have contemplated that such flaws could be identified after December 7, 2012. Indeed, while B2 Owner represented in the CM Agreement that the design was sufficient, it further agreed that any design defects would be "Owner-Caused Events." Certainly, there is tension between these provisions — as there is also with the disclaimers of warranties to which defendants point. However, such facial conflicts present questions of facts that are not suitable for resolution on this pre-answer motion to dismiss.
Changes to Scope of Work
The motion court upheld the claim that defendants breached the CM Agreement by changing the scope of work without issuing appropriate change orders. Defendants argue that plaintiff waived this claim by failing to comply with the CM Agreement's notice provisions governing change orders.
The parties agree that plaintiff's compliance with the change order notice provision was a condition precedent to the assertion of a claim for unauthorized changes in the scope of work. However, the CPLR does not require a party asserting a contract claim to plead compliance with a condition precedent (CPLR 3015[a]). Instead, it is incumbent upon the party resisting the contract claim to plead the failure to comply with the condition precedent (id.). Given defendants' failure to plead, the motion court correctly declined to dismiss the breach of contract claims.
Piercing the Corporate Veil
Veil-piercing is a narrowly construed doctrine limiting "the accepted principles that a corporation exists independently of its owners . . . and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners" (Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 140 [1993]). The party seeking to pierce the corporate veil bears the heavy burden of "showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (id. at 141; Sheridan Broadcasting Corp. v Small, 19 AD3d 331, 332 [1st Dept 2005]).
Here, plaintiff sets forth conclusory allegations merely reciting typical veil piercing factors (see e.g. Brainstorms Internet Mktg. v USA Networks, 6 AD3d 318 [1st Dept 2004]). It [*6]does not allege any fraud or malfeasance to support its attempt to reach FCRC or other third-party defendants. It alleges breach of contract claims against B2, but "a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil" (Bonacasa Realty Co., LLC v Salvatore, 109 AD3d 946, 947 [2d Dept 2013]).
Far from alleging that FCRC used B2 Owner to perpetrate a fraud, plaintiff, a sophisticated party, admits that it knowingly entered into the CM Agreement with B2 Owner, an entity formed to construct the project. Nowhere in the complaint does plaintiff allege that it believed it was contracting with or had rights vis-à-vis FCRC or any entity other than B2 Owner. Indeed, plaintiff could have negotiated for such rights. Having failed to do so, plaintiff cannot now claim that it was tricked into contracting with B2 owner only and thus should be allowed to assert claims against FCRC (see Spectra Sec. Software v MuniBEX.com, Inc., 307 AD2d 835, 835 [1st Dept 2003]; Hillcrest Realty Co. v Gottlieb, 208 AD2d 803, 805 [2d Dept 1994]; see also Brunswick Corp. v Waxman, 599 F2d 34, 36 [2d Cir 1979]). Thus, the veil-piercing claim should be dismissed. Attorney Disqualification
A movant seeking disqualification of an opponent's counsel faces a heavy burden (see Ullmann-Schneider v Lacher & Lovell-Taylor PC, 110 AD3d 469 [1st Dept 2013]). A party has a right to be represented by counsel of its choice, and any restrictions on that right "must be carefully scrutinized" (id. at 469-470 [internal quotation marks omitted]). Courts should also examine whether a motion to disqualify, made in ongoing litigation, is made for tactical purposes, so as to delay litigation and deprive an opponent of quality representation (see Solow v Grace & Co., 83 NY2d 303, 310 [1994]). The decision whether to grant a motion to disqualify rests in the discretion of the motion court (see Macy's Inc. v J.C. Penny Corp., Inc. 107 AD3d 616 [1st Dept 2013]).
Skanska USA Civil Inc. (Skanska Civil) is a wholly owned subsidiary of Skanska USA Inc. Plaintiff is likewise a wholly owned subsidiary of Skanska USA. Skanska Civil holds entities which work in various regions of the United States, including Skanska USA Southeast Inc. (Skanska Southeast). Neither Skanska Southeast's Virginia litigation nor its Florida and Maryland transactional matters have any relationship to, or involve any of the same adverse parties as, the instant action. Nor does plaintiff allege that any of Troutman's Forest City litigation team members possesses any of plaintiff's confidential information, or that the ethical screen that Troutman has set up between its Forest City and Skanska attorneys is in any other way inadequate.
The motion court therefore providently exercised its discretion in denying plaintiff's motion to disqualify the law firm. Plaintiff has not shown that, standing alone, Troutman's representation of corporate affiliates of plaintiff and adversity to one of the directors of one of plaintiff's affiliates creates a conflict of interest (see Rules of Professional Conduct [22 NYCRR 1200.0] rules 1.7[a], 1.13[a]).
We have considered the parties' remaining arguments for affirmative relief and find them unavailing.
Accordingly, the order of the Supreme Court, New York County (Saliann Scarpulla, J.), entered July 20, 2015, which, insofar as appealed from as limited by the briefs, granted the motion of defendants B2 Owner and Forest City to dismiss subparts (f) and (h) of the first cause of action and denied the motion to dismiss subparts (a), (b), and (c) of that cause of action and the third cause of action, and denied plaintiff's motion to disqualify the law firm of Troutman Sanders LLP as said defendants' attorneys, unanimously modified, on the law, to deny the motion to dismiss subpart (h) of the first cause of action, and to grant the motion to dismiss the third cause of action, and otherwise affirmed, without costs.
All concur except Gische and Kahn, JJ. who dissent in part in an Opinion by Gische, J.




GISCHE J. (dissenting in part)
 While I am in agreement with most of the majority's decision, I depart with


respect to its conclusion that defendants' Completion Guaranty is an appropriate undertaking that satisfies the requirements of Lien Law § 5. It is for this reason that I partially dissent and would reinstate subpart (f) of the first cause of action based upon defendants' alleged failure to post a bond or other undertaking as required by Lien Law § 5 [FN1].
The Atlantic Yards Project [FN2] is a sprawling $4.9 billion mixed-use mega-development encompassing 22 acres of underdeveloped public land. The New York State Development Corp d/b/a Empire State Development Corp (ESDC), a public benefit corporation created by the State of New York, partnered with defendant Forest City Ratner Companies, LLC (FCRC), a private developer, to implement and effectuate this ambitious redevelopment program, which was partly funded by the City and the State of New York. This appeal only concerns that part of the project involving the construction of a modular residential building located at 461 Dean Street in Brooklyn, referred to as the B2 tower. Defendant Atlantic Yards B2 Owner, LLC (B2 Owner), is an FCRC affiliate, as are many of the other entities involved at various stages of this project. Despite its description as "owner," B2 Owner does not, in fact, own fee title to the land upon which B2 tower is built. The land, which is publicly owned, was ultimately triple net leased by ESDC, as landlord, to another FCRC affiliate, FC Atlantic Yards B2, as tenant (Development Lease). The Development Lease, which gave the tenant the right to develop the land, was assigned to B2 Owner.
Many details of the overarching improvement project are set forth in the March 4, 2010 "Development Agreement" (Development Agreement), among ESDC, Atlantic Yards Development Company, LLC (AYDC), Brooklyn Arena, LLC, and AYDC Interim Developer, LLC (Interim Developer), an affiliate of B2 Owner. Plaintiff (Skanska) is not a party to this Development Agreement. One goal of the project was to have four towers built using modular units, because modular construction was believed to be an easier, faster, and more economical way to build than conventional construction. The B2 tower, now completed, is, at 32 stories tall, reportedly the world's tallest modular building.[FN3] Ultimately, it was the only tower at the project erected by modular construction.
Pursuant to a "Construction Management and Fabrication Services Agreement" (Construction Agreement) dated October 31, 2012, between B2 Owner and Skanska, it was agreed that Skanska would be responsible for the fabrication, delivery and erection of the [*7]modules; Skanska was also to perform and provide the attendant construction and construction management services necessary to erect the tower. There is no express requirement that B2 Owner comply with the Lien Law, although there is a general requirement that the parties comply with New York law. To further effectuate the terms of the Construction Agreement, FCRC and Skanska (and/or their respective affiliates) entered into a series of additional agreements. In one agreement, the parties joined forces to establish a new company, FC+Skanska Modular, LLC (FC+S). In a second agreement, the intellectual property of fabricating the modules, which belonged to FCRC, was transferred to FC+S. Skanska also executed another agreement, a subcontract with FC+S, making it the sole source subcontractor for fabrication of the modular units. The fabrication would take place offsite at a factory leased by FCRC; Skanska would then transport, deliver and stack them using cranes to form the tower. Skanska is not a party to the Development Lease that was subsequently entered into as of December 14, 2012. The Development Lease expressly required the tenant, which had the rights of development, to comply with Lien Law § 5. It also expressly required that FCRC provide ESDC with a guaranty, which was made as of May 13, 2013 (Completion Guaranty)[FN4]. The Completion Guaranty was a condition precedent to the commencement of work. In addition to guaranteeing completion of the work, FCRC also guaranteed that it would "use any and all amounts disbursed from time to time by the Construction Lender, solely to fully and punctually pay and discharge any and all costs, expenses and liabilities incurred for or in connection with the Guaranteed Work . . . . "
Additionally, FCRC guaranteed that
"the Guaranteed Work shall be and remain free and clear of all liens, encumbrances, claims, chattel mortgages, conditional bills of sale and other charges of any and all persons, firms, corporations or other entities furnishing materials, labor or services in constructing or completing the Guaranteed Work, provided that the Guarantor's obligations . . . shall be limited solely to the extent Tenant or Guarantor shall have received a disbursement from the Construction Lender or otherwise, for the payment of such materials, labor or services"
The B2 tower was beset with production problems from the outset, and the deadline that had been set for its substantial completion (July 25, 2014) was not met, with each party blaming the other. In December 2013, FCRC announced that it was abandoning modular construction and that the next scheduled residential tower (B3) would be built using conventional construction methods. In August 2014, Skanska notified B2 Owner that B2 Owner had breached the Construction Agreement in numerous specific ways, demanding that the breaches be cured or it would stop working on the tower and terminate the contract. Unable to settle their differences, this and other related litigation ensued.
Insofar as the Lien Law claim is concerned, the motion court's basis for dismissal was that there is no provision in the Construction Agreement expressly requiring defendants' compliance with the requirements of the Lien Law. In reaching the question of whether the Completion Guaranty satisfies Lien Law § 5, the majority implicitly accepts that the law applies to the parties' project, and I agree. This is a real estate development project involving publicly [*8]owned land improved by a private developer. The express terms of the Construction Agreement provide that the project is governed by the laws of the State of New York. That includes the Lien Law (see Dolman v United States Trust Co. of N.Y., 2 NY2d 110, 116 [1956]).
Defendants argue that even if Skanska can assert claims against them under Lien Law § 5, they are in compliance with the statute because, pursuant to the Development Lease, they provided ESDC with a Completion Guaranty. I disagree that the Completion Guaranty is a form of undertaking that satisfies the Lien Law. In general, the primary purpose of the Lien Law is to ensure that contractors, subcontractors, laborers and those who furnish materials in connection with the improvement of real property are promptly paid. Because the statute is remedial in nature, it is to be construed liberally to secure the beneficial interests and purposes thereof (Lien Law § 23). It is intended to protect financially those who have directly expended labor and materials to improve real property at the direction of a general contractor or owner of a construction project (West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co., 87 NY2d 148, 157 [1995]). Although, depending upon whether the improvement is made to public or private land, the Lien Law provides for different means of protection, the objective of making sure that protected parties are promptly paid is the same.
A private improvement is any improvement of real property not belonging to the state or a public corporation, whereas a public improvement is an improvement of any real property belonging to the state or a public corporation (Lien Law § 2[7],[8]). If the improvement is made to private property, a mechanic's lien for the amount owed to the protected party may be filed upon the property improved, affecting the owner's right, title and interest in that real property. A mechanic's lien cannot, however, be filed against improved publicly owned land (see Albany County Indus. Dev. Agency v Gastinger Ries Walker Architects, 144 AD2d 891, 892 [3d Dept 1988], appeal dismissed 73 NY2d 1010 [1989], lv denied 74 NY2d 605 [1989]; Matter of Paerdegat Boat & Racquet Club v Zarrelli, 83 AD2d 444 [2d Dept 1981], revd 57 NY2d 966 [1982] [for the reasons stated in the concurring in part and dissenting in part opinion by former Justice James D. Hopkins at the Appellate Division 83 AD2d 444, 449—452]). Instead, pursuant to Lien Law § 5, a protected party owed monies for improving public property may file a lien that attaches to the monies of the state or public corporation funding applicable to the improvement (Lien Law § 5; Matter of Paerdegat, 57 NY2d at 968, citing 83 AD2d at 449-452).
There are, however, situations where a protected party provides labor, or materials, etc., to a private entity that is improving publicly owned land for the benefit of the private entity. In those situations, a protected party is still not entitled to file a mechanic's lien against the public property, notwithstanding that the benefits inure to a private entity (Matter of Paerdegat Boat, 57 NY2d at 968, citing 83 AD2d at 449-452). Nor can the protected party attach any public funds applicable to the improvement, because no state or public corporation funding for the project has been established.
In order to address this gap in protection, Lien Law § 5 was amended in 2004 to provide the following:
"Where no public fund has been established for the financing to a public improvement with estimated cost in excess of two hundred fifty thousand dollars, the chief financial officer of the public owner shall require the private entity for whom the public improvement is being made to post, or cause to be posted, a bond or other form of undertaking guaranteeing prompt payment of the moneys due to the contractor, his or her subcontractors and to all persons furnishing labor or materials to the contractor or his or her subcontractors in the prosecution of the work on the public improvement."
The allegations in the complaint implicate the type of hybrid public/private improvement [*9]project contemplated by the 2004 Lien Law amendment, because a private entity has leased property from a public corporation, and constructed a tower. Although the parties disagree about whether the beneficial interest inures to the benefit of the public or the private entity, there are facts alleged supporting Skanska's claim that this is a hybrid improvement project primarily inuring to FCRC's benefit (see Davidson Pipe Supply Co. v Wyoming County Indus. Dev. Agency, 85 NY2d 281 [1995])[FN5]. Thus, under the facts pleaded, Lien Law § 5's requirements in situations where there is no public fund apply, thereby obligating the public owner to require the private entity to "post, or cause to be posted, a bond or other form of undertaking."
Defendants argue that even if Lien Law § 5 applies to this project, ESDC can accept some form of security other than a bond. Furthermore, they maintain that the nature and extent of the security is completely within the discretion of the public owner, claiming that in this case ESDC could have, had it wanted to, simply accepted the private developer's representations of creditworthiness as a satisfactory undertaking. Defendants maintain that FCRC's Completion Guaranty is, therefore, an acceptable and suitable "other form of undertaking," within ESDC's exercise of discretion.
B2 Owner is correct that Lien Law § 5 does not exclusively require the filing of a bond as security in these circumstances, because the express statutory language permits another form of undertaking. Not just any form of alternative security, however, will suffice. In order to achieve the objective of the Lien Law, and consistent with the legislative history of the amendment, any alternative undertaking must provide substantially equivalent protection to that provided by a bond. The alternative undertaking should be a financial arrangement that would afford an unpaid contractor, subcontractor, laborer, or provider of materials, a fund of money, or an asset, available for predictable and prompt payment. An identifiable fund of money, or a bond, or a lien against real property, are Lien Law remedies available in other contexts where services and materials are provided but not paid for, each having characteristics of ready availability.
A letter of credit, the alternative undertaking contemplated by Governor Pataki when the 2004 amendment was passed, would also fulfill these requirements. In vetoing an earlier bill to amend Lien Law § 5, Governor Pataki recommended that any new proposal should allow the public owner to require the private entity to "post" another form of undertaking, specifically suggesting a letter of credit as one possible alternative (New York State Legislative Annual 2004, Governor's Veto Message #1, Posting of Payment Bonds, A 5805, L 2003 [Tocci], p475)[FN6]. A letter of credit is an obligation undertaken by a bank to make a payment if the beneficiary fails to obtain direct payment from the applicant obtaining the letter of credit (Nissho Iwai Europe PLC v Korea First Banks 99 NY2d 115, 120 [2002], citing Federal Deposit Ins. Corp. v Philadelphia Gear Corp., 476 US 426, 428 [1986]; see also BasicNet S.p.A., 127 AD3d 157 [1st Dept 2015]). "[T]he issuing bank's obligation to honor drafts drawn on a letter of credit by the beneficiary is [*10]separate and independent from any obligation of its customer to the beneficiary under the . . . contract and separate as well from any obligation of the issuer to its customer under their agreement" (BasicNet S.p.A., 127 AD3d at 167). Thus, a letter of credit is "superior to a normal surety bond or guaranty because the issuer is primarily liable and is precluded from asserting defenses that an ordinary guarantor could assert" (id.).
The Completion Guaranty that FCRC provided in this case was a requirement of the lease and a condition precedent to commencing the work. It guarantees that B2 Owner will substantially complete the project and apply money disbursed by its lender to do the work. Although the Completion Guaranty generically states that the work will be kept "free . . . of liens," it is unclear how a mechanic's lien could be filed against the property, given its public nature, because "real property owned by a public corporation is immune to mechanic's liens" (Albany County Indus. Dev. Agency v Gastinger Ries Walker Architects, 144 AD2d at 892). A completion guaranty such as FCRC's merely "guarantees the completion of a project (usually a construction project) should the borrower be unable to do so" (Turnberry Residential Ltd. Partner, L.P. v Wilmington Trust FSB, 99 AD3d 176, 177 [2012], lv denied 20 NY3d 859 [2013]).
The Completion Guaranty is not the functional equivalent of a bond or other form of undertaking, because it is no more than FCRC's contractual promise to complete the project and pay its account, which, if not honored, requires a lawsuit to secure a judgment and a collection process to obtain satisfaction (see Crown Tire Co. v Tire Assoc. of Fairport, 177 AD2d 974 [4th Dept 1991]). Moreover, recovery is dependent upon a guarantor's particular financial circumstances at the time a protected party is in need of the remedies that the Lien Law provides. This is hardly the streamlined and predictable process Lien Law § 5 calls for in "guaranteeing prompt payment of the moneys due to the contractor . . . in the prosecution of the work on the public improvement" where there are no public funds. Nor is it an identifiable fund or asset on which a protected party can draw down payment. In other words, contractors and subcontractors on hybrid construction projects would be in a worse position in terms of a remedy than their private and public improvement counterparts, eviscerating the underlying purpose of the 2004 amendment. While I agree with the majority that it is permissible under Lien Law § 5 for FCRC to satisfy its obligations by means other than a bond, the Completion Guarantee FCRC provided does not fulfill that obligation. I would, therefore, modify the order to deny dismissal of subpart (f) of the first cause of action.
Order, Supreme Court, New York County (Saliann Scarpulla, J.), entered July 20, 2015, modified, on the law, to deny defendants Atlantic Yards B2 Owner, LLC and Forest City Ratner Companies, LLC's motion to dismiss subpart (h) of the first cause of action and to grant their motion to dismiss the third cause of action, and otherwise affirmed, without costs.
Opinion by Acosta, J.P. All concur except Gische and Kahn, JJ. who dissent in part in an Opinion by Gische, J.
Acosta, J.P., Saxe, Gische, Webber, Kahn, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: OCTOBER 20, 2016
CLERK



Footnotes

Footnote 1:I do not reach plaintiff's request for partial summary judgment because this appeal concerns only Supreme court's disposition on defendants' CPLR 3211 motion to dismiss. Plaintiff did not appeal Supreme Court's denial of its request for summary judgment treatment under CPLR 3211(c).

Footnote 2:The project has since been renamed and is now called Pacific Park, Brooklyn.

Footnote 3:http://www.designboom.com/architecture/shop-architects-461-dean-street-pacific-park-brooklyn-new-york-05-15-2016, accessed September 27, 2016 

Footnote 4:There is also a December 14, 2012 "Completion Guaranty" by FCRC in favor of the Bank of New York Mellon, the bank that extended almost $93 million in credit. The parties primarily direct their argument to the May 13, 2013 guaranty, referring to it as the "Completion Guaranty," which nomenclature I adopt in this dissent.

Footnote 5:Unlike Davidson, which involved a public agency that had only temporary status as an intermediary owner solely for tax purposes, here the land upon which B2 tower was constructed is still publicly owned (Davidson, 85 NY2d at 286). 

Footnote 6: In an internal memorandum dated July 20, 2004, sent by Governor Pataki's deputy counsel to the governor's counsel, reference is made to the governor's prior veto, because the prior bill "did not provide for security interests other than performance bonds (such as letters of credit)"(see Bill Jacket S.595 A).