Rich v J.A. Madison, LLC (2025 NY Slip Op 04818)

Rich v J.A. Madison, LLC

2025 NY Slip Op 04818

Decided on August 28, 2025

Appellate Division, First Department

KAPNICK, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: August 28, 2025
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick
Barbara R. Kapnick Martin Shulman Julio Rodriguez III LlinÉt M. Rosado

Index No. 150305/18|Appeal No. 4049|Case No. 2024-05929|

[*1]George M. Rich, et al., Plaintiffs-Respondents,
v
J.A. Madison, LLC, Defendant, Jonathan Adler Enterprises, LLC, Defendant-Appellant.

Defendant Jonathan Adler Enterprises, LLC appeals from an order of the Supreme Court, New York County (Emily Morales-Minerva, J.), entered September 24, 2024, which found it liable for codefendant J.A. Madison, LLC's breach of contract and ordered that plaintiffs have judgment against Jonathan Adler Enterprises, LLC in the amount of $179,660.00 plus interest from May 1, 2017.

Kaplan Levenson P.C., New York (Steven M. Kaplan of counsel), for appellant.
Goodfarb & Sandercock, LLP, New York (Elizabeth Sandercock and Adam D. Goodfarb of counsel), for respondents.

KAPNICK, J.

Plaintiffs George M. Rich and Regina M. Rich, doing business as Guild Antiques II, had been leasing a store at 1095 Madison Avenue since 1985. In 2005, defendant J.A. Madison, LLC leased the adjacent store at 1097 Madison Avenue, and in 2010 wished to expand its retail space by assuming plaintiffs' lease for 1095 Madison Avenue. David Frankel, president of both J.A. Madison and the parent corporation defendant Jonathan Adler Enterprises (JAE), and Jonathan Adler, the founder of JAE, approached plaintiffs, who initially were not interested in assigning their lease. Ultimately, the various parties involved entered into an "Agreement and Consent" and an "Assignment and Assumption of Lease with Landlord's Consent and Modification of Lease." In addition, plaintiffs and J.A. Madison entered into a "Consulting Agreement" on September 1, 2010, pursuant to which J.A. Madison agreed to pay plaintiffs the sum of $8,333.33 per month "until such date that the Company [J.A. Madison] vacates possession of the premises . . . [but] in no event . . . later than March 1, 2021." Although it was called a "Consulting" Agreement, there is no dispute that plaintiffs never did any "consulting" for J.A. Madison. Rather, the payments under this contract were solely in exchange for plaintiffs' agreeing to assign their lease so that J.A. Madison could expand its business into plaintiffs' adjacent premises, an arrangement affirmatively sought out by defendants. Payments were made monthly by the parent corporation, JAE, not J.A. Madison, until March 2017, when JAE's Controller Carole DeCarlo indicated to plaintiffs that business was extremely difficult and asked for a rent concession, to which plaintiff George Rich did not agree. In April, May, and June of 2017, JAE paid only $4,000 to plaintiffs, and on July 1, 2017, JAE stopped paying completely.
In January 2018, plaintiffs commenced the instant lawsuit. The first cause of action is against J.A. Madison for breach of the Consulting Agreement. The second cause of action alleges that JAE is liable for J.A. Madison's breach because the former dominated the latter. The third cause of action is for "damages" against both defendants.
After defendants answered, plaintiffs moved for summary judgment on their first cause of action, and JAE cross-moved for summary judgment dismissing the complaint as against it. Supreme Court granted plaintiffs' motion and denied JAE's cross-motion. This Court affirmed, stating in relevant part that:
"Plaintiffs raised issues of fact as to whether JAE . . . dominated J.A. Madison with respect to the transaction so as to justify piercing the corporate veil . . . . Plaintiffs pointed out that JAE paid all of J.A. Madison's debts under the consulting agreement; J.A. Madison never had its own bank account and, was dissolved while this action was pending; the two companies occupied the same offices and had overlapping personnel, including the companies' president and controller; and plaintiffs communicated with these two individuals in negotiating the contracts and in addressing the late payments under the consulting agreement. These factors, taken together, . . . raised an issue of fact as to whether J.A. Madison was JAE's alter ego" Rich v J.A. Madison, LLC, 211 AD3d 652, 653 [1st Dept 2022] [internal citations omitted].
The case proceeded to a nonjury trial in 2024. The only witnesses produced were plaintiff George Rich and JAE's controller DeCarlo; approximately 28 exhibits were also admitted into evidence.
Although the trial court incorrectly stated at the beginning of its posttrial decision that "[t]he sole issue presented is whether defendant [JAE] . . . dominated its subsidiary in the transaction 'so as to justify piercing the corporate veil to hold' parent corporation liable for the breach [of the Consulting Agreement] and resulting damages," citing to our prior decision in this case (Rich, 211 AD3d at 653), the court later properly recognized, in the "Conclusions of Law" section of its decision, that the correct test for piercing the corporate veil is two-pronged, by stating as follows:
"In the context of seeking to hold a parent corporation liable for its alter ego's actions, 'a plaintiff must show that the dominant corporation exercised complete domination and control with respect to the transaction attacked, and that such domination was used to commit a fraud or wrong, causing injury to the plaintiff' (see Fantazia Intl. Corp. v CPL Furs N.Y., 67 AD3d 511, 512 [1st Dept 2009])."
Specifically, the Court in Fantazia held:
"In order to pierce the corporate veil, a plaintiff must show that the dominant corporation exercised complete domination and control with respect to the transaction attacked, and that such domination was used to commit a fraud or wrong causing injury to the plaintiff (see Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141 [1993]). Factors to be considered include the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the allegedly dominated corporation; whether dealings between the entities are at arms' length; whether the corporations are treated as independent profit centers; and the payment or guaranty of the corporation's debts by the dominating entity. No one factor is dispositive" (id.).
The trial court correctly found that plaintiffs sufficiently met their burden for piercing the corporate veil, so as to hold the parent, JAE, liable for defendant J.A. Madison's breach of the Consulting Agreement. While George Rich, a small business owner, as opposed to a global design company with retail locations worldwide, not surprisingly, may not have had any knowledge as to the adequacy or inadequacy of J.A. Madison's capitalization, DeCarlo testified at length as to the banking procedures utilized by JAE and its subsidiaries, including J.A. Madison. While each subsidiary may have had its own profit and loss statements, DeCarlo testified that the revenues from each of the subsidiaries were swept into a single account in JAE's name at the end of each retail day. We find this situation very similar to the scheme identified in 245 E. 19 Realty LLC v 245 E. 19th St. Parking LLC (223 AD3d 604, 605-606 [1st Dept 2024]), where this Court sustained the veil-piercing claim against the Icon garage landlords, finding that the plaintiff sufficiently alleged that Icon dominated the defendant tenant with respect to the transaction attacked, "disregarding corporate formalities and intermingling funds by transferring all of Tenant's revenue to itself each day" (id. at 605). That this may have been done legally and at the behest of JAE's lenders does not change the fact that J.A. Madison's bank account was in the name of JAE, not in its own name, and that defendants used a centralized cash management system, indicative of domination and control by the parent company, which rendered J.A. Madison judgment proof and unable to pay out on any of its obligations, including its obligations under the Consulting Agreement. Clearly, this constituted an "intermingling of funds" (Fantazia, 67 AD3d at 512).
One of the many factors considered by the trial court in reaching its conclusion, although certainly not the only one, was that Frankel was the president of JAE and was also the president and only officer of J.A. Madison, so there was an overlap of J.A. Madison's only officer (cf. Fantazia, 67 AD3d at 512 [where this Court found that the mere fact that the president of one corporation was also a sub-board member and consultant to the other corporation was insufficient for finding domination]). It was also Frankel who introduced himself as president of JAE, not J.A. Madison, when he negotiated the Consulting Agreement with George Rich and signed it on behalf of J.A. Madison as its president. However, plaintiffs are not claiming that Frankel exercised complete control of J.A. Madison, but rather that JAE did so. For instance, it was JAE (not J.A. Madison) who made all the payments under the Consulting Agreement to plaintiffs from 2010 until 2017. Moreover, it was DeCarlo, the controller of JAE, the parent, not anyone from J.A. Madison, who attempted to renegotiate the terms of the Consulting Agreement, albeit unsuccessfully, with George Rich in 2017.
While J.A. Madison had its own store address and store manager, the address for service of process as well as the corporate offices for both defendants was at 333 Hudson Street. While J.A. Madison's store manager may have had some discretion as to the inventory they would carry in their store, and the way they would deal with employee problems, they certainly had no discretion as to the banking and bookkeeping issues; nor did J.A. Madison administer its own payroll. All important papers and mail were sent to the corporate offices so, as DeCarlo testified, she could look them over and keep centralized records, and then forward any relevant papers to the individual stores, if necessary.
While JAE may have treated each of its subsidiaries, including J.A. Madison, as an independent profit center on paper, as mentioned before, the daily monetary intake of J.A. Madison was swept up into the corporate account of JAE at the end of each day. The lease for the store at 1095 Madison may have been in the name of J.A. Madison, but JAE, and Jonathan Adler himself, guaranteed the Agreement and Consent to the lease assignment, which was signed by Frankel on behalf of both J.A. Madison and JAE, at substantially the same time as the Consulting Agreement, and considered a "part of the same transaction" (Rich, 211 AD3d at 653). The fact that JAE and Adler did not guarantee the subsidiary's obligations under the Consulting Agreement is in no way determinative as to whether JAE dominated J.A. Madison. Further, there is no support for the inference made by the dissent that George Rich should have anticipated, at the time of executing the Consulting Agreement, the happening of an "unexpected turn of events" which would cause defendants to stop paying.
"Because a decision to pierce the corporate veil in any given instance will necessarily depend on the attendant facts and equities, there are no definitive rules governing the varying circumstances when this power may be exercised" (Baby Phat Holding Co., LLC v Kellwood Co., 123 AD3d 405, 407 [1st Dept 2014]). However, under the totality of the circumstances presented here, we conclude that plaintiffs met their heavy burden of showing that "[JAE] exercised complete domination of [J.A. Madison] in respect to the transaction attacked[,] [specifically the Consulting Agreement]" (see Skanska USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC, 146 AD3d 1, 12 [1st Dept 2016] [internal quotation marks omitted], affd 31 NY3d 1002 [2018]). Thus, we will address the second prong of the test - namely, whether plaintiffs met their burden to show "that such domination was used to commit a fraud or wrong against the plaintiff[s] which resulted in plaintiff[s'] injury" (id. [internal quotation marks omitted]).
The trial court, in dealing with this second prong in its posttrial decision, found that JAE "exercised complete discretion in its decision to stop paying the rent as set forth in the subject of the transaction, which caused plaintiffs' injury." The trial court went on to find that "[a]dding to said injury, [JAE] then exercised sole discretion to dissolve [J.A. Madison] during the pendency of this action, leaving plaintiff[s] with no recourse on proven damages — a wrong and injustice that invites a court in equity, as here, to intervene (see generally Morris, 82 NY2d at 141)."
"Wrongdoing in this context does not necessarily require allegations of actual fraud. While fraud certainly satisfies the wrongdoing requirement, other claims of inequity or malfeasance will also suffice (see TNS Holdings v MKI Sec. Corp., 92 NY2d 335, 339 [1998]). Allegations that corporate funds were purposefully diverted to make it judgment proof or that a corporation was dissolved without making appropriate reserves for contingent liabilities are sufficient to satisfy the pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-ego theory (Grammas v Lockwood Assoc., 95 AD3d 1073 [2d Dept 2012])" (Baby Phat, 123 AD3d at 407-408 [emphasis added]; see also BP 399 Park Ave. LLC v Pret 399 Park, Inc. 150 AD3d 507, 508).
The law does not require that the parent company's actions be fraudulent, only that it result in a wrong or an inequity. The factual situation we find ourselves in here is very similar to the one contemplated by Baby Phat. The evidence presented at trial showed that JAE used its domination of J.A. Madison to commit a wrong against plaintiffs by stopping payments to plaintiffs under the Consulting Agreement, causing J.A. Madison to become judgment proof, and then by dissolving J.A. Madison after this action had already been commenced, making plaintiffs' judgment against J.A. Madison nothing more than a pyrrhic victory. The fact that J.A. Madison may have initially been created for a legitimate purpose of operating a store selling Jonathan Adler merchandise and products does not change the analysis.
Accordingly, the order of the Supreme Court, New York County (Emily Morales-Minerva, J.), entered September 24, 2024, which found defendant Jonathan Adler Enterprises, LLC liable for codefendant J.A. Madison, LLC's breach of contract and ordered that plaintiffs have judgment against Jonathan Adler Enterprises, LLC in the amount of $179,660.00 plus interest from May 1, 2017, should be affirmed, without costs.
All concur except for Renwick, P.J. and Shulman, J. who dissent in an Opinion by Renwick, P.J.:
RENWICK, P.J., dissenting
In this breach of contract action, plaintiffs claim that defendant J.A. Madison breached its retail consultancy services agreement (Consulting Agreement) and that defendant Jonathan Adler Enterprises, LLC (JAE), the parent company of J.A. Madison, should be liable for the breach under a veil-piercing theory, as J.A. Madison was a mere instrumentality of it. On a prior appeal, we found that "[t]he court correctly granted plaintiffs summary judgment on their breach of contract claim against J.A. Madison" and that JAE's cross-motion for summary judgment dismissing the complaint against it was correctly denied (Rich v J.A. Madison, LLC, 211 AD3d 652, 652-653 [1st Dept 2022]). The case proceeded to a nonjury trial, in which the court found JAE liable for J.A. Madison's breach of contract. This appeal ensued.
On appeal, the majority finds "that plaintiffs sufficiently met their burden for piercing the corporate veil so as to hold the parent, JAE, liable for . . . J.A. Madison's breach of [contract]." I would find that piercing the corporate veil to hold JAE liable for the judgment against J.A. Madison was not warranted by the facts established at trial, absent a showing of abuse of the corporate form. Accordingly, I respectfully dissent.
As a general rule, a corporation exists independently of its owners, as a separate legal entity, and a corporation's owners are not liable for the debts of the corporation (see Anderson v Abbott, 321 US 349, 361-363 [1944]; Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 140 [1993]). Formation of a corporation by its owner for the purpose of limiting liability of the owner is perfectly legal and valid (Morris, 82 NY2d at 140). However, New York courts will disregard the corporate form, or pierce the corporate veil, to hold a corporation's owners liable for the debts of the corporation whenever necessary to prevent an injustice or to achieve equity (id. at 142).
"Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised" (id. at 141; see also Stephen B.Presser, Piercing the Corporate Veil § 2.33 [1], at 2-291-2-293). However, "[g]enerally, a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30, 47 [2018] [internal quotation marks omitted]). In other words, plaintiff must show both an abuse of the corporate form (the domination prong) and that the abuse was committed for the purpose of defrauding plaintiff or committing some other wrongdoing (the fraud prong) (see id. at 47-48; see also TNS Holdings v MKI Sec. Corp., 92 NY2d 335, 339 [1998]; Cobalt Partners, L.P. v GSC Capital Corp, 97 AD3d 35, 40 [1st Dept 2012]). Those who seek to pierce the corporate veil "bear a heavy burden" (TNS Holdings, 92 NY2d at 339; see Etage Real Estate LLC v Stern, 211 AD3d 632, 633 [1st Dept 2022]).
This heavy burden was not met here. Rather the majority focuses on the domination prong and gives short shrift to the equally important fraud prong. Without satisfying both prongs, piercing the corporate veil fails.
To begin, the majority makes much of the fact that David Frankel was both the president of JAE and J.A. Madison, and the only officer of J.A. Madison. However, this fact alone does not require that the corporate form be disregarded. Even if Frankel exercised complete control of J.A. Madison by having been the president of both JAE and J.A. Madison, such dominance alone is not enough (see Kahan Jewelry Corp. v Coin Dealer of 47th St., Inc., 173 AD3d 568, 569 [1st Dept 2019]; Skanka USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC, 146 AD3d 1, 12-13 [1st Dept 2016], affd 31 NY3d 1002 [2018]). Plaintiffs were required to establish that Frankel, through his domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against plaintiffs, which they failed to do.
It is uncontested that J.A. Madison had a legitimate purpose in its formation and carried out its legitimate business of operating a store selling "Jonathan Adler" merchandise and products (see Sheridan Broadcasting Corp. v Small, 19 AD3d 331, 332 [1st Dept 2005] ["(a)n inference of abuse (of the corporate structure) does not arise . . . where a corporation was formed for legal purposes or is engaged in legitimate business"], quoting TNS Holdings, 92 NY2d at 339-340). J.A. Madison operated as a separate entity from JAE, entering into a lease for a space on Manhattan's Madison Avenue with its own manager and employees. Moreover, at its inception, the Consulting Agreement was an arm's length transaction that benefited all parties involved, including plaintiffs. The Consulting Agreement, which was jointly entered into with two other agreements (the consent and assignment agreements), permitted J.A. Madison to expand its business into plaintiffs' premises in exchange for a $1 million fee, payable on monthly installments. At the time, both J.A. Madison and JAE were established businesses. Thus, plaintiffs could not possibly claim that JAE established J.A. Madison (one of JAE's most profitable retail stores) to defraud plaintiffs. Nor did plaintiffs allege, let alone prove, that either JAE or J.A. Madison engaged in a single act of deception or fraud at any stage of the parties' negotiations, from the inception and during the entire seven-year period of these transactions.
Ostensibly, the only wrong plaintiffs alleged is that JAE, through Frankel, acted improperly when he caused J.A. Madison to stop making the monthly payments, as mandated by the Consulting Agreement, and then dissolved J.A. Madison. Contrary to the majority's findings, there was nothing fraudulent, malfeasant, or illegal about Frankel's actions taken on behalf of JAE and J.A. Madison. Indeed, no evidence was adduced contradicting JAE comptroller Carole DeCarlo's explanation that these drastic actions taken were strictly a business decision to shut down a failing store. At the time, as DeCarlo explained, JAE and its subsidiaries were facing hard times and they asked all their landlords and vendors for concessions. When plaintiffs refused to help J.A. Madison address its dire situation, the latter exercised its reasonable business judgment to shut the store down.
Significantly, plaintiffs clearly understood that JAE and J.A. Madison were separate entities and plaintiffs negotiated the Consulting Agreement solely with J.A. Madison, not JAE. Thus, nothing prevented plaintiffs from protecting themselves from the unexpected turn of events by obtaining security or a personal guarantee from JAE and/or its owners. Having failed to do so, plaintiffs cannot now claim that they were deceived into contracting solely with J.A. Madison and, consequently, should be allowed to assert claims against JAE (see Skanska USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC, 146 AD3d at 12-13; G & Y Maintenance Corp. v Core Cont. Constr. LLC, 215 AD3d 553, 554 [1st Dept 2023]; Spectra Sec. Software v MuniBEX.com, Inc., 307 AD2d 835, 835-836 [1st Dept 2003]; Hillcrest Realty Co. v Gottlieb, 208 AD2d 803, 805 [2d Dept 1994]; see also Brunswick Corp. v Waxman, 599 F2d 34, 36 [2d Cir 1979]).
The majority, however, finds that plaintiffs should not be blamed for not anticipating the "happening of an 'unexpected [business] turn of events' which would cause defendants to stop paying," because plaintiffs were simply small business owners. However, nothing in the record suggests that plaintiffs were anything but sophisticated businesspeople. Indeed, plaintiffs not only leased a sizeable property on Madison Avenue, in the affluent Upper East Side of Manhattan, but they were able to negotiate a deal where J.A. Madison agreed to pay plaintiffs $8,333.33 per month until it vacated the premises, up to March 1, 2021, which constituted a potential total payment of more than $1 million over a 10-year period. In the world of business, there's a widely accepted principle that the potential for a large reward typically comes with a concomitant or accompanying risk.
Contrary to the majority's determination, this simple breach of contract does not constitute the type of wrong warranting the piercing of the corporate veil (see e.g. Skanska USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC, 146 AD3d at 12 ["a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil"], quoting Bonacasa Realty Co., LLC v Salvatore, 109 AD3d 946, 947 [1st Dept 2013]; see also New York City Waterfront Dev. Fund II, LLC v Pier A Battery Park Assoc., LLC, 206 AD3d 565, 567 [1st Dept 2022] [The allegation that a corporation caused its subsidiary to breach a contract is insufficient to show the requisite wrongdoing]).
To be sure, the wrongdoing needed to pierce the corporate veil does not necessarily require allegations of actual fraud. However, the Court of Appeals has reiterated that the requirements of piercing the corporate veil are not easy to meet because the party seeking this rare legal remedy "bear[s] a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences" (TNS Holdings, 92 NY2d at 339; see also Baby Phat Holding Co., LLC v Kellwood Co., 123 AD3d 405, 407 [1st Dept 2014]). The fact that J.A. Madison may have been judgment proof at the time it was dissolved does not justify holding JAE liable for J.A. Madison's breach of contract, where there is no evidence of any intentionally deceptive or willfully unjust behavior at issue. The majority's suggestion that by "stopping payments to plaintiffs under the Consulting Agreement, [JAE] caus[ed] J.A. Madison to become judgment proof" is mere speculation. Again, it is undisputed that what caused the unexpected downfall of J.A. Madison was strictly the failure to generate business.
Moreover, none of the cases the majority relies on supports piercing the corporate veil under these circumstances. This is not a case like BP 399 Park Ave. LLC v Pret 399 Park, Inc. (150 AD3d 507 [1st Dept 2017]), where the plaintiff brought suit against Pret 399 Park, Inc. (Pret) and its parent company, Pret A Manger (USA), (Pret Parent) for breach of a commercial lease between the plaintiff and Pret (id. at 508). Pret Parent moved for summary judgment on the basis that it was not a signatory to the lease and the motion court granted summary judgment (id.).
This Court reversed the grant of summary judgment to Pret Parent because there was an issue of fact as to whether Pret Parent could be liable on a theory of piercing the corporate veil (id.). We found that the "[d]efendants did not dispute that Pret Parent as opposed to Pret was the entity operating a cafÉ at the premises . . ." (id. at 508-509). More importantly, Pret Parent admitted that Pret was a shell, that is, a special purpose entity, an "assetless" LLC that was created expressly for the purpose of signing the lease so that Pret Parent would not have any liability under the lease (id.). In BP 399 Park Ave. LLC, unlike this case, there was a question of fact as to whether the defendants' actions were done for a nefarious purpose, as there was evidence suggesting that Pret Parent had essentially duped the plaintiff into entering into a lease with Pret, even though Pret Parent was actually the tenant and Pret was "an assetless entity" (id.).
Nor is this case like Baby Phat where the plaintiff entered into an agreement with the defendant's wholly owned subsidiary, Phat Fashions, LLC (PFLLC) to purchase certain intellectual property. The plaintiff asserted a claim for alter ego liability against the defendant based upon the allegations that (i) it negotiated directly with the defendant, not PFLLC; (ii) the defendant grossly misrepresented certain royalty income that was due from certain trademarks that were being sold; and (iii) the defendant caused PFLLC to become judgment proof by purposely diverting funds from PFLLC and dissolving PFLLC without making appropriate reserves for contingent liabilities (Baby Phat, 123 AD3dat 407-408). The defendant moved to dismiss the claim alleging that the plaintiff had not stated a claim for alter ego liability (id. at 407). The motion court denied the motion and this Court affirmed finding that the allegations were sufficient to satisfy the pleading standards for alter ego liability (id. at408).
Unlike in Baby Phat, the trial evidence demonstrated that plaintiffs were keenly aware JAE and J.A. Madison were separate entities. They negotiated the Consulting Agreement solely with J.A. Madison, not JAE. Moreover, as indicated, there are no allegations or evidence of any acts by JAE's of wrongdoing or misrepresentation (or J.A. Madison) when the Consulting Agreement was negotiated and signed. In fact, plaintiffs admitted at trial that neither JAE nor J.A. Madison ever made any misrepresentations to them. The majority accentuates the fact that J.A. Madison's funds were diverted to JAE. However, from its store opening in 2010, J.A. Madison's revenue was swept from its own accounts to JAE's accounts as contractually required by J.A. Madison's lenders who held a first lien position on both JAE's and J.A. Madison's assets and bank accounts. Parenthetically, loan agreements requiring a daily sweep of accounts is a lawful business practice for lenders and financial institutions to reduce outstanding debt. Notably, there was no proof presented at trial that JAE purposefully diverted funds from J.A. Madison to render the latter judgment proof. Indisputably, after executing the Consulting Agreement in 2010, plaintiffs always received its monthly $8, 333.33 fee until March 2017 when JAE and its subsidiaries began experiencing serious business setbacks. This business practice was not the type of improper diverting of funds that was alleged in Baby Phat.
Nor is this a case like 245 E. 19 Realty v 245 E. 19th St. Parking LLC (223 AD3d 604 [1st Dept 2024]), where the plaintiff alleged that the defendants "conspired to divert garage revenue from Icon garage landlords (including plaintiff) by . . . daily sweeping all revenue collected by the tenants into an Icon-controlled master account and not paying any of it as rent, even if there was sufficient revenue to do so" (id. at 605 [internal quotation marks omitted]). As DeCarlo's unchallenged testimony made clear, this is not a case where J.A. Madison had the money to pay plaintiffs, even in the absence of the daily sweep required by their lenders.
For the foregoing reasons, I would reverse. Neither justice nor equity mandates piercing the corporate veil under the facts here. Plaintiffs obtained precisely what they bargained for, and they did not bargain for or contemplate the liability of JAE that they now seek to enforce. The creation of the subsidiary corporation under these circumstances to eliminate the responsibility of the parent corporation should be respected.
Order, Supreme Court, New York County (Emily Morales-Minerva, J.), entered September 24, 2024, affirmed, without costs.
Opinion by Kapnick, J. All concur except Renwick, P.J. and Shulman J. who dissent in an Opinion by Renwick, P.J.
Renwick, P.J., Kapnick, Shulman, Rodriguez, Rosado, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: August 28, 2025